### STATE OF CONNECTICUT *v.* PAUL FRANCIS
### (SC 16830)

Sullivan, C. J., and Borden, Norcott, Palmer and Zarella, Js.

Argued May 19—officially released December 30, 2003

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *Timothy J. Liston*, state's attorney, and *Russell C. Zentner*, assistant state's attorney, for the appellant (state).

*Michael O. Sheehan*, special public defender, with whom were *George Kouros* and *Richard A. Reeve*, for the appellee (defendant).

### Opinion

ZARELLA, J. The defendant, Paul Francis, was convicted, following a jury trial, of murder in violation of General Statutes § 53a-54a (a),[1] felony murder in violation of General Statutes § 53a-54c,[2] burglary in the first degree in violation of General Statutes § 53a-101 (a) (2),[3] burglary in the second degree in violation of General Statutes (Rev. to 1995) § 53a-102 (a),[4] arson in

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

[2] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[3] General Statutes § 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

[4] General Statutes (Rev. to 1995) § 53a-102 (a) provides: "A person is guilty of burglary in the second degree when he enters or remains unlawfully in a dwelling at night with intent to commit a crime therein."

the first degree in violation of General Statutes § 53a-111 (a) (1),[5] larceny in the third degree in violation of General Statutes § 53a-124 (a) (1),[6] and criminal mischief in the first degree in violation of General Statutes § 53a-115 (a) (1).[7] The trial court rendered judgment in accordance with the jury's verdict,[8] from which the defendant appealed to the Appellate Court. On appeal to the Appellate Court, the defendant claimed, inter alia, that the trial court had abused its discretion by denying him access to certain psychiatric treatment records of Thomas Uhlman, who was one of the state's key witnesses.[9] *State* v. *Francis*, 70 Conn. App. 571, 576, 800 A.2d 574 (2002). The Appellate Court reversed the judgment of conviction and remanded the case for a new trial concluding that the trial court had abused its discretion by not disclosing Uhlman's records, and that such error was not harmless beyond a reasonable

[5] General Statutes § 53a-111 (a) provides in relevant part: "A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied . . . ."

[6] General Statutes § 53a-124 (a) provides in relevant part: "A person is guilty of larceny in the third degree when he commits larceny, as defined in section 53a-119, and: (1) The property consists of a motor vehicle, the value of which is five thousand dollars or less . . . ."

[7] General Statutes § 53a-115 (a) provides in relevant part: "A person is guilty of criminal mischief in the first degree when: (1) With intent to cause damage to tangible property of another and having no reasonable ground to believe that such person has a right to do so, such person damages tangible property of another in an amount exceeding one thousand five hundred dollars . . . ."

[8] The trial court sentenced the defendant to a total effective term of ninety years imprisonment.

[9] Subsequent to the Appellate Court's decision, Uhlman waived his statutory privilege of confidentiality; see General Statutes § 17a-688; with regard to his treatment records referenced by the Appellate Court. Consequently, these records were released to both parties in this appeal. Although the defendant's claim of entitlement to the records might appear to be no longer at issue in this appeal due to the subsequent release of those records, because we disagree with the conclusion of the Appellate Court we review the state's appeal on its merits.

doubt. Id., 579. Thereafter, we granted the state's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that the trial court improperly determined that certain requested psychiatric assessment records did not contain any information that required disclosure to the defense?" *State* v. *Francis*, 261 Conn. 925, 806 A.2d 1062 (2002). We reverse the judgment of the Appellate Court based on our conclusion that, although the trial court abused its discretion in denying the defendant access to the requested records, any error was harmless.

The jury reasonably could have found the following relevant facts. The defendant, who had spent much of his adult life in prison, had been released from his most recent incarceration, when, in the summer of 1995, he began to socialize with Thomas Uhlman and his brother, Glen Uhlman, with whom the defendant previously had been acquainted. Thomas Uhlman testified that, in July or August of 1995, while he was fishing with the defendant, the defendant vowed that he would never return to prison, and that if he committed a future crime he would destroy the scene by fire so as to obliterate any incriminating evidence.

The Uhlman brothers shared an apartment on Spring Street, in Portland, in an old three-story building containing four apartments. The Uhlman brothers occupied the first floor front apartment. Their mother, Ruth Mary Uhlman, who was the victim, occupied the first floor rear apartment. Jeffrey Harmon occupied the second floor apartment, and Linda Wierenga occupied the third floor apartment.

During the fall and winter of 1995, the defendant, who was largely transient and often camped in the woods, stayed with friends or relatives, or lived in abandoned buildings, began to frequent the Uhlman broth-

ers' apartment. Thomas Uhlman became uneasy about the defendant's frequent presence at the apartment and prohibited him from spending nights there. In addition, Uhlman testified, the victim had told him that the defendant "gave her the creeps."

On December 18, 1995, according to the testimony of both Thomas Uhlman and Glen Uhlman, the defendant and the Uhlmans quarreled over the defendant's insistence that he be allowed to remain in the apartment, despite the Uhlmans' demand that he leave. In the course of ejecting the defendant, Thomas Uhlman and the defendant scuffled on the porch. Ten minutes later, the defendant telephoned Thomas Uhlman and informed him that he had thrown a bucket filled with sand through the windshield of Thomas Uhlman's car. Thomas Uhlman called the police and, while he was inspecting his car, the defendant returned and they had a violent encounter in the driveway. During the course of the confrontation, Thomas Uhlman wounded the defendant's leg with a machete. The defendant then left.

Meanwhile, Officer Ron Milardo of the Portland police department responded to Thomas Uhlman's call and, while Milardo was in the Uhlmans' apartment, the defendant telephoned Thomas Uhlman, who gave the telephone to Milardo. The defendant admitted to Milardo that he had caused the damage to the car. The next day, the defendant called Glen Uhlman, complained about having been struck by Thomas Uhlman, and, according to Glen Uhlman's testimony, the defendant stated, "I don't care if he's your brother or not. Tom is all done." When Glen Uhlman informed the victim of this entire incident, she told him that she was fearful of the defendant.

On January 1, 1996, in the early afternoon, Thomas Uhlman gave Glen Uhlman and his girlfriend, June Moynahan, a ride to her home in Meriden. Thomas Uhlman

used the victim's car, which was a noisy 1981 car in poor condition. At approximately 8 p.m., Thomas Uhlman went outside and into the detached garage to fuel the snowblower. He then had a conversation with the victim about borrowing her car the next morning, and he fell asleep in his apartment at approximately 11:30 p.m. Harmon and his guest, Maria Thibodeau, fell asleep in his second floor apartment at approximately 2 a.m. Wierenga had fallen asleep at approximately 10:30 p.m. in her third floor apartment.

At approximately 4:20 a.m., on January 2, 1996, Mary Lou Raicik, a next-door neighbor, was awakened by the sounds of a noisy car backing out of the driveway of the Uhlmans' house and speeding away. In addition, Wierenga testified that she was awakened by the sound of a car door slamming, and that she heard a car drive out of the driveway. She looked out of the window and saw that Thomas Uhlman's car was parked in the driveway. Moments later, she smelled smoke, saw smoke pouring out of the victim's apartment, called 911, and left her apartment. She then went downstairs and pounded on Thomas Uhlman's door, yelling, "Fire! Fire! Get out!" Harmon and Thibodeau already had been alerted by the smoke and were evacuating the building. Wierenga then ran into the front yard.

Upon hearing Wierenga's warning, Thomas Uhlman jumped out of bed, ran to the victim's apartment, pushed the door open and saw that the apartment was already engulfed in flames. He ran back to his apartment, grabbed his dog, ran into the yard, and gave the dog to Wierenga. He then ran around to the side of the victim's apartment, where he tried unsuccessfully to gain entrance through the outer doors and windows. Thereafter, he returned to the front yard. After the arrival of the firefighters and the police, both Thomas Uhlman and Wierenga noticed that the victim's car was missing.

The ensuing investigation disclosed that the victim's hands and feet had been bound, and that she had died of traumatic asphyxia, most likely by manual suffocation by means of some object having been pressed into her face. A combustible liquid had been poured in two separate places in the victim's apartment and intentionally had been ignited. Also, the police discovered a can of "Repel" pepper spray on the floor of the garage. Thomas Uhlman testified that it had not been there at 8 p.m. on January 1, when he had fueled the snowblower. Glen Uhlman testified that the can was identical to one that the defendant had showed him one month earlier. Also, the police recovered the key to the trunk of the victim's car in her bedroom, but not the key to the ignition.

John Levesque testified that, at 5:20 p.m., on the evening of January 1, 1996, the defendant briefly had visited his apartment in Portland, which was less than one mile from the victim's home, and that he had left on foot. In addition, Linda Garneau, who knew the defendant, testified that she saw him walking on Spring Street in Middletown at 5:50 a.m. on the morning of January 2, 1996. At 1:40 p.m., on January 2, the Middletown police discovered the victim's car parked in a residential parking lot on Pearl Street in Middletown, which was less than one mile from the defendant's most recent residence on Spring Street in Middletown.

On January 4, 1996, the defendant burglarized his sister's home and stole a shotgun and ammunition. He left behind a note saying that he was fleeing to Massachusetts, that he was determined not to return to prison, and that he would commit suicide to prevent that from happening. On January 5, 1996, the defendant was sighted walking along a road in Middletown by the Middletown police, who had a warrant for his arrest on an unrelated matter. As the police approached the defendant, he discarded the shotgun and fled. When

the defendant was apprehended, a search of his clothing disclosed the ignition key to the victim's car. He claimed both that the key belonged to him, and that he had found the key.

At trial, the defendant's principal defense was that Thomas Uhlman, rather than the defendant, had committed the murder. In support of this defense, the defendant sought to introduce Uhlman's confidential treatment records from the Connecticut Valley Hospital, where Uhlman had received treatment for substance abuse in February, 1996, approximately one month after the murder. According to the defendant, the records revealed information about the relationship between Uhlman and the victim that supported the defendant's third party culpability defense. Furthermore, the defendant sought access to Uhlman's treatment records because he believed that they contained information that could have been used to impeach Uhlman's credibility as a witness. Pursuant to the state's motion in limine seeking to preclude disclosure of these records, the trial court conducted an in camera review of the records, and subsequently ordered that they remain sealed. Thereafter, the state called Thomas Uhlman as one of its witnesses and he testified as to the incriminating statement allegedly made by the defendant during their 1995 fishing trip that, "if he ever did another crime . . . he would burn the place to the ground to cover the evidence." On cross-examination, Uhlman also testified that he had been drinking on the fishing trip, and that he did not recall the defendant's statement until February, 1996. Uhlman further testified that he had been drinking at the time he recalled the statement, and that his drinking on this occasion would have affected his memory. At the conclusion of the trial, the defendant was found guilty on all counts.

On appeal to the Appellate Court, the defendant claimed that the trial court abused its discretion by not

disclosing Thomas Uhlman's treatment records.[10] The defendant had sought access to the records for the purpose of: (1) establishing a third party culpability defense, specifically, that Uhlman, not the defendant, murdered the victim; and (2) impeaching Uhlman's credibility, specifically, his ability to recollect the inculpatory statement previously made by the defendant to Uhlman. The Appellate Court held that the trial court's refusal to disclose Uhlman's treatment records constituted an abuse of discretion that deprived the defendant of his rights under the sixth amendment to the United States constitution to present a defense and to confront witnesses. *State* v. *Francis*, supra, 70 Conn. App. 582. Specifically, the Appellate Court held that the trial court's ruling deprived the defendant of his right to present a defense because it prevented his acquisition of evidence that he could have used to establish third party culpability. Id., 579. The Appellate Court also determined that, because the treatment records contained information about Uhlman's alcohol consumption during certain relevant periods, the trial court should have disclosed the records for impeachment purposes. Id., 580. Thus, the failure to disclose the records also violated the defendant's right to confrontation because it limited his right to impeach Uhlman's testimony and to attack his credibility. Id., 581. Finally, the Appellate Court concluded that the trial court's error in refusing to disclose the records was not harmless. Id., 582. This appeal followed.

---

[10] Because the Appellate Court's resolution of this issue in the defendant's favor resulted in the ordering of a new trial, that court did not reach the defendant's other claims, namely, "that (1) the trial court's charge to the jury on circumstantial evidence improperly lowered the state's burden of proof on the element of intent, and (2) the state's repeated reference to his invocation of his right to remain silent and his request for a lawyer violated his fifth amendment right and his right to due process under the fourteenth amendment." *State* v. *Francis*, supra, 70 Conn. App. 573 n.1. Having reversed the judgment of the Appellate Court on the limited certified issue, we leave these remaining claims to be considered by the Appellate Court on remand.

We conclude that the Appellate Court incorrectly held that the trial court abused its discretion by not disclosing Uhlman's treatment records pursuant to the defendant's third party culpability defense, but that the Appellate Court correctly held that the trial court abused its discretion by not disclosing the records for impeachment purposes. We, nonetheless, reverse the judgment of the Appellate Court based on our conclusion that any error was harmless.

As a threshold matter, we set forth the standard by which we review the trial court's determination concerning the disclosure of confidential records. "We recently have reiterated that [a]ccess to confidential records should be left to the discretion of the trial court which is better able to assess the probative value of such evidence as it relates to the particular case before it . . . and to weigh that value against the interest in confidentiality of the records. . . . *State* v. *Slimskey*, 257 Conn. 842, 856, 779 A.2d 723 (2001). . . . Once the trial court has made its inspection, the court's determination of a defendant's access to the witness' records lies in the court's sound discretion, which we will not disturb unless abused. . . . [Id.] On appeal, the appellate tribunal reviews the confidential records to determine whether the trial court abused its discretion in concluding that no information contained therein is especially probative of the victim's ability to know and correctly relate the truth so as to justify breaching their confidentiality in disclosing them to the defendant. *State* v. *Storlazzi*, 191 Conn. 453, 460, 464 A.2d 829 (1983). We are mindful that the restriction of a defendant's access to a witness' confidential records implicates the defendant's constitutional right to impeach and discredit state witnesses. . . . *State* v. *Bruno*, 236 Conn. 514, 532, 673 A.2d 1117 (1996)." (Citation omitted; internal quotation marks omitted.) *State* v. *Delgado*, 261 Conn. 708, 718–19, 805 A.2d 705 (2002).

## I

We first address whether the trial court should have afforded the defendant access to Thomas Uhlman's treatment records for the purpose of establishing his third party culpability defense. The defendant claims that the trial court abused its discretion by refusing to disclose Uhlman's treatment records that, he asserts, contained information supporting the defense's theory that Uhlman committed the murder. Specifically, the defendant argues that the records revealed that Uhlman experienced a lot of guilt following the victim's murder and, that, had the defendant been provided access to this information, he could have explored this fact as it related to his third party culpability defense. Further, the defendant argues that the records revealed the extent of Uhlman's history of alcohol abuse. According to the defendant, this was a tremendous source of friction between Uhlman and the victim, and, thus, any information demonstrating the level of Uhlman's alcohol abuse would have added weight to his defense theory. The Appellate Court concluded that the trial court's decision denying the defendant access to the treatment records constituted an abuse of discretion because they contained information about Uhlman's state of mind that was favorable and material to the third party culpability defense. *State* v. *Francis*, supra, 70 Conn. App. 578. On the basis of our independent review of the records, we disagree with the Appellate Court with respect to the defendant's third party culpability theory, and we conclude that, because these records contain no relevant information pertaining to the defense theory, the trial court did not abuse its discretion by refusing to disclose the records.

"It is well established that a defendant has a right to introduce evidence that another person committed the offense with which the defendant is charged. *State* v. *Hernandez*, 224 Conn. 196, 202, 618 A.2d 494 (1992).

Third party suspect evidence is admissible if it *directly* connects the third party to the crime. *State* v. *Echols*, 203 Conn. 385, 392, 524 A.2d 1143 (1987). It is not enough [however] to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. . . . *State* v. *Hernandez*, supra [202]." (Internal quotation marks omitted.) *State* v. *Sauris*, 227 Conn. 389, 401, 631 A.2d 238 (1993).

"[I]t is within the sound discretion of the trial court to refuse to admit such evidence when it simply affords a possible ground of possible suspicion against another person. *State* v. *Giguere*, [184 Conn. 400, 405, 439 A.2d 1040 (1981)]; see also *State* v. *John*, 210 Conn. 652, 670, 557 A.2d 93 (1989). *State* v. *Delossantos*, 211 Conn. 258, 270, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989). The trial court's ruling on the relevancy of third party inculpatory evidence will be reversed on appeal only if the court has abused its discretion or an injustice appears to have been done. Id., 271." (Internal quotation marks omitted.) *State* v. *Payne*, 219 Conn. 93, 117, 591 A.2d 1246 (1991).

With this legal background in mind, we believe that the trial court acted well within its discretion by refusing to disclose Thomas Uhlman's treatment records based on the defendant's third party culpability defense. The defendant informed the trial court that he needed access to the records as a means of establishing the level of discontent that existed between Uhlman and the victim. In support of his third party culpability defense, the defendant elicited testimony that, approximately two months prior to the murder, Uhlman and the victim had engaged in an argument concerning Uhlman's drinking habits and his use of her car. Testimony was also presented that Uhlman was experiencing financial difficulties prior to the murder. According to

the defendant, these difficulties, combined with the defendant's drinking, created a constant source of conflict between Uhlman and the victim. Further, the defendant highlighted the fact that Wierenga, one of the state's witnesses, had testified on cross-examination that Uhlman appeared emotionally flat after realizing the victim had not escaped the fire.[11]

We are mindful that the present situation involves not only whether Thomas Uhlman's treatment records sufficiently connect him to the victim's murder, but also whether the evidence is so probative as to outweigh his right to maintain the confidentiality of these records. As we previously indicated, evidence of third party culpability must *directly* connect the third party to the crime. In our view, feelings of guilt and reported alcohol abuse do not satisfy this high standard. In fact, Uhlman's records arguably do not even raise a bare suspicion that he may have murdered the victim, given the multitude of other explanations that existed for why he was feeling guilty and began drinking heavily subsequent to her death. Indeed, the treatment records reveal that Uhlman was "very close" to the victim and had "worked hard in treatment to build a better relationship with her." The records do not contain any information directly connecting Uhlman with the victim's murder, nor do they establish that Uhlman ever maintained a violent disposition or demonstrated violent tendencies toward her at any time in the past. Thus, we reverse the judgment of the Appellate Court concluding that the trial court abused its discretion by refusing to disclose Uhlman's treatment records based on the defendant's third party culpability defense.

---

[11] The state counters this by pointing out that Wierenga, as well as several other witnesses, including Harmon, William Lewis, a fire investigator for the state police, and Sharon Wheeler, the owner of the property, subsequently testified that Uhlman appeared distraught at the crime scene.

## II

We next address whether the trial court should have disclosed Thomas Uhlman's treatment records for impeachment purposes. The defendant claims that the trial court abused its discretion by refusing to disclose Uhlman's treatment records, which would have enabled the defendant to impeach Uhlman's testimony concerning the statement the defendant allegedly made to Uhlman in July or August, 1995, that "if he ever did [commit] another crime . . . he would burn the place to the ground," and Uhlman's subsequent recollection of this statement in February, 1996. Furthermore, the defendant contends that the records reveal the extent of Uhlman's alcohol abuse and that the jury could have inferred from this information that Uhlman's ability to perceive and recollect certain relevant events was highly questionable.

Prior to ruling on whether to disclose Thomas Uhlman's records, the trial court informed the defendant that it would allow any evidence pertaining to Uhlman's alcohol consumption on the days in question, but that evidence concerning Uhlman's status as an "alcoholic" would not be admissible for impeachment purposes. Thereafter, the trial court refused to disclose Uhlman's records after that court had conducted an in camera review of the evidence. The Appellate Court held that the trial court abused its discretion with regard to the defendant's ability to impeach Uhlman because the records contained material about Uhlman's alcohol consumption during certain relevant time periods, which was "probative of [Uhlman's] ability to observe, recollect and narrate the events about which he testified." *State* v. *Francis*, supra, 70 Conn. App. 580–81. On the basis of our independent review of the treatment records, we agree with the Appellate Court that, because the records contain information pertaining to

Uhlman's sensory capacity, the trial court abused its discretion by refusing to disclose the evidence.

"A criminal defendant has a constitutional right to cross-examine the state's witnesses, which may include impeaching or discrediting them by attempting to reveal to the jury the witnesses' biases, prejudices or ulterior motives, or facts bearing on the witnesses' reliability, credibility, or sense of perception. *Delaware* v. *Fensterer*, 474 U.S. 15, 19, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985); *Davis* v. *Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *State* v. *Storlazzi*, [supra, 191 Conn. 457]. Thus, in some instances, otherwise privileged records, like the ones in this case, must give way to a criminal defendant's constitutional right to reveal to the jury facts about a witness' mental condition that may reasonably affect that witness' credibility. *State* v. *Hufford*, 205 Conn. 386, 401–402, 533 A.2d 866 (1987); *State* v. *Pierson*, 201 Conn. 211, 227, 514 A.2d 724 (1986), on appeal after remand, 208 Conn. 683, 546 A.2d 286 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989)." *State* v. *Slimskey*, supra, 257 Conn. 853–54. "[T]he linchpin of the determination of the defendant's access to [confidential] records is whether they sufficiently disclose material especially probative of the ability to comprehend, know and correctly relate the truth . . . so as to justify breach of their confidentiality and disclos[ure] . . . in order to protect [the defendant's] right of confrontation." (Internal quotation marks omitted.) Id., 856–57.

We acknowledge that "[w]e have never held that a history of alcohol or drug abuse or treatment automatically makes a witness fair game for disclosure of psychiatric records to a criminal defendant." *State* v. *Joyner*, 225 Conn. 450, 479, 626 A.2d 791 (1993); *State* v. *D'Ambrosio*, 212 Conn. 50, 60, 561 A.2d 422 (1989), cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990). Where, as in the present case, however, the

trial court does examine the records and those records indicate a long, persistent and serious history of alcohol and drug abuse and blackouts, and evidence was presented that the witness was drinking at the relevant times in question, common sense dictates that a jury should have that information before it in order properly to gauge the witness' general credibility. Furthermore, other courts have held that, "[w]here . . . the proffered evidence is that the condition of alcoholism causes the witness to suffer blackouts when he drinks, and evidence has been presented that the witness was drinking near the time of the events of which he testifies, then the evidence is admissible as probative of the witness' sensory capacity." *People* v. *Di Maso*, 100 Ill. App. 3d 338, 343, 426 N.E.2d 972 (1981); see *State* v. *Hawkins*, 260 N.W.2d 150, 158 (Minn. 1977). Each case must be gauged on its own facts.

Our review of Thomas Uhlman's treatment records, viewed in conjunction with the testimony presented at trial, convinces us that portions of these records directly relate to his credibility and, therefore, should have been disclosed by the trial court. At trial, as a result of the trial court's ruling, Uhlman was presented to the jury as someone who did not start drinking heavily until after the victim's murder. Without quoting the records chapter and verse, suffice it to say that the records disclose the following. Uhlman began abusing both alcohol and marijuana at age twelve or thirteen, and had been doing so almost daily and consistently since that time. In addition, he had attempted suicide three times, and was subject to blackouts. He had been repeatedly diagnosed as both an alcohol and drug abuser, and had been in and out of several voluntary detoxification programs.

Thomas Uhlman's records further indicate that following the victim's murder on January 2, 1996, up until the time he was discharged from the Connecticut Valley

Hospital on February 21, 1996, he had abused alcohol and drugs typically to the point of passing out. Further, the records revealed that Uhlman had experienced "blackouts" specifically as a result of this recent drug and alcohol binge. Additionally, the records indicated that he had been unable to sleep as a result of the victim's murder, that he had been drinking continuously since the day of her death, and that whenever he stopped drinking he experienced the "shakes," which caused him to start drinking again. Further, the records revealed that Uhlman had been smoking marijuana several times a day since the victim's death and also had abused the drug Xanax. The records also indicated, however, that Uhlman claimed to have been sober for the eight months prior to the victim's murder.

As previously noted, the defendant sought these records for the purpose of revealing to the jury the extent of Thomas Uhlman's substance dependency from which the jury could have inferred that he had an impaired ability to perceive and recollect relevant events and, more specifically, to impeach Uhlman's testimony concerning his sensory capacity on the day the defendant allegedly made the inculpatory statement in July or August, 1995, and the day on which Uhlman subsequently recalled this event in February, 1996. Uhlman testified at trial that he had split a six-pack of beer with the defendant on the day the defendant made the statement, and that his memory on this day was unaffected by this alcohol consumption. Uhlman also testified that, in late February, 1996, at the time he recalled the defendant having made the statement, his consumption of alcohol on that day would have affected his ability to recall past events.

On the basis of the foregoing, we conclude that Thomas Uhlman's records contained information demonstrating that he suffered from a condition that may have "substantially affected [his] ability to . . . recall

or narrate events at issue in the trial." *State* v. *Cardinal*, 194 Conn. 114, 119, 478 A.2d 610 (1984). Specifically, Uhlman's records reveal an extreme state of substance dependency during relevant time periods, and that he was prone to "blackouts" as a result of his drinking and drug usage. Furthermore, the testimony presented at trial indicated that Uhlman had been drinking both at the time the statement was made and on the day he recalled the statement. Thus, the records disclose a history that (1) seriously undermines how Uhlman was presented as a witness to the jury, and (2) shows a long, persistent and serious history of both alcohol abuse and drug usage, which, on the facts of the present case, the jury should have been given in order to evaluate his overall credibility. Accordingly, the records were probative of Uhlman's capacity to relate the truth or recollect relevant occurrences, which, as previously noted, is the linchpin in determining whether disclosure is warranted. See *State* v. *Slimskey*, supra, 257 Conn. 856. Therefore, we agree with the Appellate Court that the trial court should have disclosed the treatment records for impeachment purposes and that its failure to do so constituted an abuse of discretion.

### III

In light of our conclusion, we next must consider whether the trial court's improper refusal to disclose Thomas Uhlman's treatment records violated the defendant's constitutional rights, or whether the error was merely evidentiary in nature. See *State* v. *Kirsch*, 263 Conn. 390, 412, 820 A.2d 236 (2003).[12] "Our law in this regard is well settled. The right of an accused to effec-

---

[12] "If the claim is of constitutional magnitude, the state has the burden of proving the constitutional error was harmless beyond a reasonable doubt. . . . Otherwise, in order to establish reversible error on an evidentiary impropriety, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." (Citations omitted.) *State* v. *Kirsch*, supra, 263 Conn. 412.

tively cross-examine an adverse witness is embodied in the confrontation clause of the sixth amendment. . . . The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. . . . *State* v. *Asherman*, 193 Conn. 695, 718, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. *State* v. *Gaynor*, 182 Conn. 501, 509, 438 A.2d 749 (1980), quoting *Davis* v. *Alaska*, [supra, 415 U.S. 318]. Indeed, if testimony of a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to reveal any infirmities that cast doubt on the reliability of that testimony. *State* v. *Morant*, 242 Conn. 666, 682, 701 A.2d 1 (1997). The defendant's right to cross-examine a witness, however, is not absolute. *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985) ([e]very evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error). Therefore, a claim that the trial court unduly restricted cross-examination generally involves a two-pronged analysis: whether the aforementioned constitutional standard has been met, and, if so, whether the court nonetheless abused its discretion . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Clark*, 260 Conn. 813, 826–27, 801 A.2d 718 (2002).

In *State* v. *Slimskey*, supra, 257 Conn. 858, we stated that "there is . . . a minimum level of cross-examination that must be afforded to the defendant into matters affecting the reliability and credibility of the state's

witnesses." Accordingly, in that case, we held that, because the trial court's failure to disclose treatment records was an abuse of discretion that deprived the defendant of an opportunity to pursue a relevant line of inquiry, such error amounted to a constitutional violation. Id., 859.

In the present case, the trial court refused to disclose Thomas Uhlman's records, which would have allowed the jury to evaluate the life altering effects that drugs and alcohol may have had on his life. Moreover, although the trial court allowed the defendant to ask Uhlman questions on cross-examination regarding his alcohol consumption on particular days, the court completely denied the defendant any opportunity to inquire into Uhlman's extensive history of substance abuse, which, as we have already determined, was relevant to his credibility as a witness. Therefore, the trial court's refusal to disclose Uhlman's records is a constitutional violation, which requires the state to establish its harmlessness beyond a reasonable doubt. In our view, the state has met that burden in this case.

In addition to Thomas Uhlman's testimony, the state supported its case with several incriminating statements made by the defendant to the police following his arrest, testimony that the defendant had confessed to his cellmates, on three separate occasions, that he had committed the crime, and testimony of numerous disinterested witnesses, all of which was fully consistent with the defendant's guilt. As we just noted, following his arrest by Middletown police on a warrant for an unrelated crime, the defendant made a number of inconsistent and incriminating statements to various police personnel. The defendant stated to Detective Charles Jacobucci, " 'I did something real bad. I'm going to jail for the rest of my life.' " He told Officer David Visconti that, if he knew he would be facing a murder charge, he would starve himself to death. He stated to

state police Detective Richard Bedard, that he had been fishing with a prostitute on the night of the murder, and he did not respond when he was asked if he carried pepper spray. The defendant stated to Middletown police Sergeant Louis Tosto that he'd "probably get life," that he "wanted to get it over with," and that he likely would "get twenty for the burglaries and fifty for this." The defendant told Bedard and Detective Martin Graham that the Middletown police had planted the victim's ignition key on him.

Furthermore, three of the defendant's former cellmates, Patrick Weeman, Robert Swabski and Richard Harrison, testified that while each was incarcerated with the defendant, he had confessed to them that he had committed the murder. First, Weeman testified that he was a cellmate of the defendant for approximately one and one-half weeks sometime in February, 1996. Weeman testified that during his period of incarceration with the defendant, the defendant told him that around New Year's Eve of 1996, he had set fire to the home of an elderly woman after forcibly gaining entrance, tying her to a chair and strangling her. Weeman further testified that the defendant claimed that he stole the woman's car after setting the fire.

Swabski testified that he had overheard the defendant admit to committing the murder while they were being transferred back to prison from the Middletown courthouse on April, 15, 1997. Swabski testified that, although the defendant was not talking directly to him on this occasion, he knew what murder the defendant was referring to because Swabski was friends with Glen Uhlman. Swabski further testified that, once they had arrived at the Hartford correctional center, he and the defendant were placed in a holding cell together and the defendant once again admitted committing the murder. This time, however, the defendant also told Swabski that when he was arrested, he was in possession of a

key, which he was going to claim that the Middletown police planted on him, and also that he intended to blame the murder on someone named Tom.

Harrison testified that he was a cellmate of the defendant for two months in 1997. Harrison testified that, although the defendant eventually confessed to committing the murder, he at first denied having any involvement, and he claimed that he would succeed at trial. Harrison further testified that, after this initial denial, the defendant gradually began revealing facts about the incident, such as that he had run out of money and went to the victim's house to burglarize it. According to Harrison, the defendant admitted that during the course of the burglary, he either "whacked" or strangled the victim, and then he set fire to the place in order to hide the evidence. The defendant also told Harrison that he took the key to the victim's car and left the scene after setting the place on fire. Harrison testified that the defendant informed him that the police had found the victim's car key in the defendant's pocket when they arrested him, and that he planned on claiming that the police had planted this evidence on him. According to Harrison, the defendant claimed to have had problems in the past with the victim's son. Harrison also testified that he sought favorable treatment in return for his testimony concerning the murder, but that this request was denied. Harrison further testified that the state offered to send a letter to the parole board for him in exchange for his testimony, but that this occurred subsequent to the statement he had given to police.

Finally, the testimony of numerous other witnesses, such as Glen Uhlman, Wierenga, Raicik, Levesque and Garneau, supported the defendant's guilt. Specifically, Wierenga and Raicik testified that around the time of the murder, they were awakened by the sounds of a noisy car speeding away from the area. Furthermore,

the testimony of Levesque and Garneau established that the defendant was in the area of the victim's home on the night of the murder, that he had arrived there on foot, and that, subsequent to the murder, the defendant was seen in the vicinity of where the victim's car was discovered later that day. The testimony of other witnesses confirmed that, at the time of his arrest, the defendant was in possession of a car key that was capable of starting the victim's car. Additionally, Glen Uhlman testified that he witnessed the defendant in possession of a can of pepper spray approximately one month prior to the murder, which was identical to the can found near the crime scene.

The defendant's defense was that he had not committed the murder, arson and car theft, and that, in fact, Thomas Uhlman had probably done so. He testified that, shortly after the incident in which he threw the bucket of sand through the windshield of Uhlman's car, they had reconciled. The defendant testified further that, on the night of the crime, he and Uhlman drank beer and smoked marijuana and crack cocaine in Uhlman's apartment, that they then drove in Uhlman's car to Middletown to buy more drugs, with the defendant driving because Uhlman's license was suspended, that he parked the car in the Pearl Street lot while Uhlman bought the drugs, that he drove Uhlman back to his apartment at 1 a.m., and that Uhlman told him to drive himself back to Middletown in the victim's car and leave it in the same parking lot. The defendant further testified that following his arrest, he repeatedly has denied committing the murder and that he never made the alleged confessions that the state introduced at trial.

The defendant attempted to impeach Thomas Uhlman's credibility on cross-examination with evidence of his drinking. Uhlman denied drinking any alcohol on the night in question. With regard to the conversation in the summer of 1995, when, according to Uhlman's testimony, the defendant told Uhlman that he would

cover up any future crimes by arson, Uhlman admitted that they had split a six-pack of beer at that time, and that he only recalled that conversation in February, 1996, after being arrested for driving under the influence. Uhlman also admitted that his consumption of alcohol at the time he recalled the defendant's statement affected his memory and ability to recall.

The defendant raises two issues in support of his claim that the state has failed to prove that the trial court's error was harmless. First, the defendant claims that any argument that such error was harmless assumes that "jail-house informants are reliable witnesses." Further, the defendant points to the fact that Uhlman was characterized by the Appellate Court as a "key" state witness and that, had the jury discredited his testimony as a result of the information contained within the treatment records, "the state's case would have been very significantly weakened."

On the basis of the foregoing information, including the defendant's arguments on appeal, we are persuaded that the state has satisfied its burden. First, this court views the defendant's third party culpability defense as weak and implausible, and wholly uncorroborated. Moreover, it required the jury to believe, not only that Thomas Uhlman murdered the victim for some unstated financial reasons, but that he did so in a particularly brutal way, and that he covered up the murder by an arson that not only highly endangered both the upstairs tenants but himself as well.

Second, the state's case was very strong, irrespective of Thomas Uhlman's testimony, including his testimony of the 1995 conversation with the defendant. As the detailed rendition of the evidence discloses, the state's case, supported by physical evidence and the testimony of numerous disinterested witnesses, and on the testimony of witnesses who corroborated most of Thomas Uhlman's other testimony, was fully consistent with the

defendant's guilt, and inconsistent with his uncorroborated version of his reconciliation with Thomas Uhlman on the fatal New Year's Eve. The testimony of Wierenga, Raicik, Garneau and Levesque was particularly telling in this regard. In addition, the defendant's conduct after the crime was filled with evidence and statements of consciousness of guilt, such as his burglary of his sister's house and the note he left. Additionally, he made numerous incriminating statements to five different police officers, and made three separate, detailed confessions to three separate cellmates at three different times. Furthermore, his possession of the victim's car key was highly incriminating, and he gave several inconsistent explanations for it, none of which was consistent with his testimony at trial. Finally, there was Glen Uhlman's testimony about the defendant's possession of the can of pepper spray, which was never contradicted or explained. Thus, in our view, the evidence, irrespective of any uncorroborated testimony of Thomas Uhlman, pointed unerringly to the defendant's guilt, and to no one else's. Further, the defendant has not presented this court with any support for his contention that the jury found the jailhouse witnesses to be less reliable than the other witnesses, nor is there any support in the law for such a proposition. See *United States* v. *Westmoreland*, 240 F.3d 618, 627–28 (7th Cir. 2001) (confessions to cellmates meet "requirement that 'particularized guarantees of trustworthiness' be present").

As we have discussed, the trial court abused its discretion in refusing to disclose Thomas Uhlman's treatment records for the purposes of impeaching his testimony. Nevertheless, the defendant was able to attack the reliability of this testimony by eliciting through cross-examination that Uhlman's drinking had affected his capacity to recollect this event. Therefore, viewing the trial court's error in the context of the entire trial, we are persuaded beyond a reasonable doubt that the verdict would have been the same, even if Uhlman's

credibility had been impeached by his confidential records.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to consider the defendant's remaining claims on appeal.

In this opinion the other justices concurred.