STATE OF CONNECTICUT *v.* PAUL FRANCIS
(AC 21647)

Schaller, Flynn and DiPentima, Js.

Argued March 25—officially released June 1, 2004

*Michael O. Sheehan,* special public defender, with whom, on the brief, were *Richard A. Reeve* and *Sarita I. Ordonez,* for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *Timothy J. Liston*, state's attorney, and *Russell C. Zentner*, assistant state's attorney, for the appellee (state).

SCHALLER, J. The defendant, Paul Francis, was convicted, following a jury trial, of murder in violation of General Statutes § 53a-54a (a), felony murder in violation of General Statutes § 53a-54c, burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), burglary in the second degree in violation of General Statutes § 53a-102 (a), arson in the first degree in violation of General Statutes § 53a-111 (a) (1), larceny in the third degree in violation of General Statutes § 53a-124 (a) (1) and criminal mischief in the first degree in violation of General Statutes § 53a-115 (a) (1). We reversed the judgment of conviction and remanded the case for a new trial, concluding that the trial court had abused its discretion by not disclosing the psychiatric records of one of the state's key witnesses and that such error was not harmless beyond a reasonable doubt. *State* v. *Francis*, 70 Conn. App. 571, 579, 800 A.2d 574 (2002), rev'd, 267 Conn. 162, 836 A.2d 1191 (2003). Thereafter, our Supreme Court granted the state's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that the trial court improperly determined that certain requested psychiatric assessment records did not contain any information that required disclosure to the defense?" *State* v. *Francis*, 261 Conn. 925, 806 A.2d 1062 (2002). Our Supreme Court reversed this court's judgment because, "although the trial court abused its discretion in denying the defendant access to the requested records, any error was harmless." *State* v. *Francis*, 267 Conn. 162, 166, 836 A.2d 1191 (2003). The case was remanded to this court with the "direction to consider the defendant's remaining claims on appeal." Id., 188. The defendant's

remaining claims on appeal are that (1) the state's reference to his invocation of his right to remain silent and his request for an attorney violated his constitutional rights pursuant to *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), and (2) the trial court's charge to the jury on circumstantial evidence improperly lowered the state's burden of proof on the element of intent. We disagree.

The relevant facts can be found in *State* v. *Francis*, supra, 267 Conn. 166–70. We now restate the facts relevant to the defendant's two remaining claims. "[I]n the summer of 1995, [the defendant] began to socialize with Thomas Uhlman and his brother, Glen Uhlman, with whom the defendant previously had been acquainted. Thomas Uhlman testified that, in July or August of 1995, while he was fishing with the defendant, the defendant vowed that he would never return to prison, and that if he committed a future crime he would destroy the scene by fire so as to obliterate any incriminating evidence.

"The Uhlman brothers shared an apartment on Spring Street, in Portland, in an old three-story building containing four apartments. The Uhlman brothers occupied the first floor front apartment. Their mother, Ruth Mary Uhlman, who was the victim, occupied the first floor rear apartment. Jeffrey Harmon occupied the second floor apartment, and Linda Wierenga occupied the third floor apartment.

"During the fall and winter of 1995, the defendant, who was largely transient and often camped in the woods, stayed with friends or relatives, or lived in abandoned buildings, began to frequent the Uhlman brothers' apartment. Thomas Uhlman became uneasy about the defendant's frequent presence at the apartment and prohibited him from spending nights there. . . .

"On December 18, 1995, according to the testimony of both Thomas Uhlman and Glen Uhlman, the defendant and the Uhlmans quarreled over the defendant's insistence that he be allowed to remain in the apartment, despite the Uhlmans' demand that he leave. In the course of ejecting the defendant, Thomas Uhlman and the defendant scuffled on the porch. Ten minutes later, the defendant telephoned Thomas Uhlman and informed him that he had thrown a bucket filled with sand through the windshield of Thomas Uhlman's car. Thomas Uhlman called the police and, while he was inspecting his car, the defendant returned and they had a violent encounter in the driveway. . . . The defendant then left. . . .

"The next day, the defendant called Glen Uhlman, complained about having been struck by Thomas Uhlman, and, according to Glen Uhlman's testimony, the defendant stated, 'I don't care if he's your brother or not. Tom is all done.' . . .

"On January 1, 1996 . . . Thomas Uhlman . . . fell asleep in his apartment at approximately 11:30 p.m. Harmon and his guest, Maria Thibodeau, fell asleep in his second floor apartment at approximately 2 a.m. Wierenga had fallen asleep at approximately 10:30 p.m. in her third floor apartment.

"At approximately 4:20 a.m., on January 2, 1996, Mary Lou Raicik, a next-door neighbor, was awakened by the sounds of a noisy car backing out of the driveway of the Uhlmans' house and speeding away. In addition, Wierenga testified that she was awakened by the sound of a car door slamming, and that she heard a car drive out of the driveway. She looked out of the window and saw that Thomas Uhlman's car was parked in the driveway. Moments later, she smelled smoke, saw smoke pouring out of the victim's apartment, called 911, and left her apartment. She then went downstairs

and pounded on Thomas Uhlman's door, yelling, 'Fire! Fire! Get out!' . . .

"Upon hearing Wierenga's warning, Thomas Uhlman jumped out of bed, ran to the victim's apartment, pushed the door open and saw that the apartment was already engulfed in flames. He ran back to his apartment, grabbed his dog, ran into the yard, and gave the dog to Wierenga. He then ran around to the side of the victim's apartment, where he tried unsuccessfully to gain entrance through the outer doors and windows. Thereafter, he returned to the front yard. After the arrival of the firefighters and the police, both Thomas Uhlman and Wierenga noticed that the victim's car was missing.

"The ensuing investigation disclosed that the victim's hands and feet had been bound, and that she had died of traumatic asphyxia, most likely by manual suffocation by means of some object having been pressed into her face. A combustible liquid had been poured in two separate places in the victim's apartment and intentionally had been ignited. Also, the police discovered a can of 'Repel' pepper spray on the floor of the garage. Thomas Uhlman testified that it had not been there at 8 p.m. on January 1, when he had fueled the snowblower. Glen Uhlman testified that the can was identical to one that the defendant had showed him one month earlier. Also, the police recovered the key to the trunk of the victim's car in her bedroom, but not the key to the ignition.

"John Levesque testified that, at 5:20 p.m., on the evening of January 1, 1996, the defendant briefly had visited his apartment in Portland, which was less than one mile from the victim's home, and that he had left on foot. In addition, Linda Garneau, who knew the defendant, testified that she saw him walking on Spring Street in Middletown at 5:50 a.m. on the morning of January 2, 1996. At 1:40 p.m., on January 2, the Middle-

town police discovered the victim's car parked in a residential parking lot on Pearl Street in Middletown, which was less than one mile from the defendant's most recent residence on Spring Street in Middletown.

"On January 4, 1996, the defendant burglarized his sister's home and stole a shotgun and ammunition. He left behind a note saying that he was fleeing to Massachusetts, that he was determined not to return to prison, and that he would commit suicide to prevent that from happening. On January 5, 1996, the defendant was sighted walking along a road in Middletown by the Middletown police, who had a warrant for his arrest on an unrelated matter. As the police approached the defendant, he discarded the shotgun and fled. When the defendant was apprehended, a search of his clothing disclosed the ignition key to the victim's car. He claimed both that the key belonged to him, and that he had found the key." *State* v. *Francis*, supra, 267 Conn. 166–70. The defendant was detained and arrested on the unrelated matter. On May 5, 1997, the defendant was arrested and charged with the victim's murder. Additional facts will be set forth as necessary.

I

The defendant claims that the state's reference to his invocation of his right to remain silent and his request for an attorney violated his constitutional rights pursuant to *Doyle* v. *Ohio*, supra, 426 U.S. 610. The defendant cites to the testimonial evidence presented in the state's case-in-chief, the defendant's case-in-chief, the state's rebuttal and during closing arguments.

The following additional facts are necessary to resolve the claim. On direct examination during the state's case-in-chief, the state asked state police Detective Richard Bedard:

"[The Prosecutor]: What else did you ask [the defendant]?

"[The Witness]: We had asked him if he heard about the fire at Ruth Uhlman's in Portland. He said, yes, he did, and we asked him what he was doing at the time of the fire. He said that he was fishing with a prostitute. We tried to elaborate on that. He wouldn't elaborate on that anymore. He was smiling and joking about it. Wasn't serious at all. And from that point, we tried to change the subject a little bit, and I asked him about now, if he carried pepper spray, and he didn't answer, and then he asked him again. *He still didn't answer, and then he asked for an attorney and the interview was concluded.*" (Emphasis added.)

Moments later, the state asked Bedard:

"[The Prosecutor]: Now, on the date—let's stay with the date of January 6, 1996. You indicated a few moments ago that at one point when you were talking to [the defendant], you and Detective Martin Graham, that he asked for a lawyer and the conversation terminated?

"[The Witness]: Yes."

On the same day, the state similarly asked state police Detective Graham about the January 6, 1996 interview with the defendant:

"[The Prosecutor]: What else did [the defendant] say?

"[The Witness]: At that particular time—this was a brief conversation and only lasted about fourteen minutes. He asked for an attorney. At that time, the questioning stopped.

"[The Prosecutor]: Before the questioning stopped, prior to the time he asked for an attorney, at that time did you or Detective Bedard ask him anything concerning an item known as pepper spray?"

Following Graham's testimony, outside the presence of the jury, the court stated: "[Defense counsel] has not objected to [the] testimony so far. I feel a little

uncomfortable with the defendant's [invocation] of his right to counsel."

In response, the state filed a request to charge and stated:

"[The Prosecutor]: The court did mention—that did come in without objection; however, out of an abundance of caution I filed a request to charge, and I am respectfully urging that the court issue this request to the jury now and perhaps once again during its final instructions.

"The Court: [Defense counsel]?

"[Defense Counsel]: I don't have any problems with it coming in now. I was going to ask for it at the end, but it's not a problem."

The court issued the state's request to charge after the testimony of both officers. The court instructed the jurors, inter alia, that they should not "draw any adverse inference from the fact that the defendant elected to terminate the interview and asked to be represented by counsel, which is his right to do."

On direct examination during the defendant's case-in-chief, defense counsel stated:

"[Defense Counsel]: And when they asked you about the [pepper spray], you became silent after that?

"[The Defendant]: Yes.

\* \* \*

"[The Defendant]: . . . [S]o, right there, they're just trying to pin a murder on me, and I'm innocent, so I didn't say anything."

During its rebuttal case, the state presented additional witnesses in response to the defendant's testimony. The state questioned Bedard in relevant part as follows:

"[The Prosecutor]: What did you say to him with regard to pepper spray?

"[The Witness]: I asked him why he carried pepper spray.

"[The Prosecutor]: And was there a response at all?

"[The Witness]: No, he didn't respond at all.

\* \* \*

"[The Prosecutor]: Did you ever indicate anything else regarding pepper spray?

"[The Witness]: The only thing that I can recall is that I had asked him why he carried the pepper spray, and there was just no answer. He didn't indicate an answer."

During closing argument, the state made the following comment while summarizing Graham's and Bedard's testimony: "They ask him why he carries pepper spray. They don't tell him they found pepper spray. He asked him, why do you carry pepper spray? No response from [the defendant]."

As part of the court's final instruction, the court charged the jury as follows:

"Now, ladies and gentlemen, during the—I think it was last week, you may recall the testimony of Detectives Bedard and Graham that on January 6, 1996, the defendant asked for an attorney at the end of an interview. The defendant has every right to terminate [questioning] and ask for a lawyer at any time. This testimony should not be given any weight or any credence by you. It should not be discussed. It should not [be] give[n] any type of believability whatsoever. You must draw no adverse inference because the defendant elected to terminate an interview, which is his right to do. It's a right that we all enjoy in this country. It's a right that you

enjoy, and a right that I enjoy. It involves no culpability whatsoever, no inference of culpability. The evidence was merely offered by the state to show investigative efforts were made by police and the sequence of events that took place."

We note that the defendant did not preserve his claim. Consequently, he seeks review of his unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We review his claim because the record is adequate for review, and the claim is of constitutional magnitude. Id.

Pursuant to *Doyle*, "evidence of a defendant's postarrest . . . silence [and silence after being advised of his constitutional rights as required by *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)] is constitutionally impermissible under the due process clause of the fourteenth amendment. . . . A *Doyle* violation also encompasses a prosecutor's comment upon a defendant's statement requesting an attorney. . . . With respect to post-*Miranda* warning . . . silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." (Citations omitted; internal quotation marks omitted.) *State* v. *Daugaard*, 231 Conn. 195, 210–11, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995).

Without deciding whether the state committed a *Doyle* violation, we conclude that any error was harmless and would not have affected the verdict. Our conclusion is based on our Supreme Court's harmless error analysis conducted in *State* v. *Francis*, supra, 267 Conn. 182–86. *Doyle* violations are subject to harmless error analysis. "The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent.

. . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case. . . .

"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. . . . The state bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt. . . . That determination must be made in light of the entire record [and the strength of the state's case without the improper testimonial evidence being admitted]." (Citations omitted; internal quotation marks omitted.) *State* v. *Daugaard,* supra, 231 Conn. 212.

We first set forth our Supreme Court's harmless error analysis from *State* v. *Francis,* supra, 267 Conn. 162. Our Supreme Court held in *Francis* that even though the trial court abused its discretion in refusing to disclose Thomas Uhlman's substance abuse treatment records, any such error was harmless beyond a reasonable doubt. Id., 186–87. "[T]he state's case was very strong . . . . As the detailed rendition of the evidence discloses, the state's case, supported by physical evidence and the testimony of numerous disinterested witnesses, [and witnesses whose testimony] . . . was fully consistent with the defendant's guilt, and inconsistent with his uncorroborated version of his reconciliation with Thomas Uhlman on the fatal New Year's Eve. The testimony of Wierenga, Raicik, Garneau and Levesque was particularly telling in this regard. In addition, the defendant's conduct after the crime was filled with evidence and statements of consciousness of guilt, such as his burglary of his sister's house and the note he left. Additionally, he made numerous incriminating statements to five different police officers, and made three separate, detailed confessions to three separate cellmates at three different times. Furthermore, his possession of the victim's car key was highly incriminating, and he gave

several inconsistent explanations for it, none of which was consistent with his testimony at trial. Finally, there was Glen Uhlman's testimony about the defendant's possession of the can of pepper spray, which was never contradicted or explained. Thus, in our view, the evidence . . . pointed unerringly to the defendant's guilt, and to no one else's." Id.

The state's comments did "not strike at the jugular of the defendant's story . . . [and could not be considered an] extensive, strongly-worded argument suggesting a connection between the defendant's silence and his guilt." (Internal quotation marks omitted.) *State* v. *Pepper*, 79 Conn. App. 1, 16, 828 A.2d 1268, cert. granted on other grounds, 266 Conn. 919, 837 A.2d 801 (2003). All references to the defendant's request for an attorney related to the can of pepper spray that was found on the floor of the garage. Only two witnesses expressly referred to the defendant's invocation of his right to remain silent, and the prosecution referred to it scantily in this fourteen day trial. As discussed, the state's case was very strong. The verdict was supported by both physical evidence and the testimony of numerous disinterested witnesses. The matter of the defendant's pepper spray that was found in the garage was circumstantial evidence that was a small link in the chain of evidence in the state's case. The disputed questions and comment do not strike at the jugular of the defendant's story.

The court also gave two curative instructions to the jury, one immediately after the two witnesses mentioned the defendant's invocation of his right to remain silent and again at the end of the trial. The defendant did not object and acquiesced in the instructions. Further, the defendant made affirmative use of his invocation of his right to remain silent to support his defense that the murder was being "pinned" on him by the police.

Accordingly, we conclude that any alleged *Doyle* violation would be harmless and that the jury would have returned a guilty verdict without the disputed questions or comment on the defendant's invocation of his right to remain silent.

## II

The defendant next claims that the court's charge to the jury on circumstantial evidence improperly lowered the state's burden of proof beyond a reasonable doubt on the element of intent. We disagree.

The court's instructions relating to circumstantial evidence and the element of intent, in relevant part, were as follows: "Now, there are, generally speaking, two kinds of evidence, direct and circumstantial evidence. Direct evidence is testimony by a witness about what the witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, proof from a chain of facts from which you can find that another fact exists, distinction between direct and circumstantial evidence as far as probative value. The law permits you to give equal weight to both, but it is for you to decide how much weight to give to any particular evidence. By way of example, this is only an example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night. Other evidence, such as a turned on garden hose, may, however, explain the water on the sidewalk. Therefore, before you decide that a fact has been proven by circumstantial evidence, you must consider all of the evidence in the light of reason, experience and common sense.

"You are to consider only the evidence that has been admitted in the trial in front of you. However, in consideration of that evidence, you are not limited to what a witness says. On the contrary, you are permitted to draw from the facts which you find to have been proven such reasonable and logical inferences as seem justified

in the light of your own experience. An inference is a deduction or conclusion which reason and common sense lead you to draw from the facts which the evidence has established. You may not, however, resort to speculation or conjecture. The state's burden of proof applies to each and every element comprising each of the offenses charged. . . . [A]ny ultimate fact and all elements must be proven beyond a reasonable doubt. Moreover, a conclusion of guilt requires proof beyond a reasonable doubt. . . ."

Subsequently, the court charged the jury on intent. "Intent is a charge that I will read to you now, and then it will be read to you repeatedly when we get into the actual charge, and it is such a reoccurring concept that when we get to that second point in the instruction, I'm going to give you a copy of it.

"Intent relates to the condition of mind of a person who commits the act, his purpose in doing it. As defined by our statute, a person acts, quote, intentionally, unquote, with respect to a result or to conduct when his conscious objective is to cause such result or to engage in such conduct. What a person's purpose, intention or knowledge has been is usually a matter to be determined by inference. No person is able to testify that they looked into another's mind and saw therein a certain purpose or intention or a certain knowledge to do harm to another. The only way in which a jury can ordinarily determine what a person's purpose, intention or knowledge was, and at any given time, aside from that person's own statements or testimony, is by determining what that person's conduct was and what the circumstances were surrounding that conduct and, from that, to infer what the purpose, intention or knowledge was. To draw such an inference is not only the privilege, but also the proper function of the jury, provided, of course, that the inference drawn complies with the standards for inferences as explained in con-

nection with my instruction on circumstantial evidence."

The court's instruction also reminded the jurors on numerous occasions that the state bore the burden of proof. The instruction also defined the required mental state for each crime and instructed the jurors that their determination of those elements must be guided by the reasonable doubt standard.

The defendant did not preserve his claim for appellate review, but nonetheless seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. We review his claim because the record is adequate for review and the claim is of constitutional magnitude. Id.

"When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *DeJesus*, 260 Conn. 466, 473, 797 A.2d 1101 (2002).

The defendant argues that because the words "beyond a reasonable doubt" were not specifically mentioned in the portion of the charge relating to circumstantial evidence, and because the court later instructed the jury that intent is proven by inferences and referred back to the circumstantial evidence charge, the instruction ran afoul of the constitutional requirement that intent be proven beyond a reasonable doubt.

The defendant's claim fails because the alleged constitutional violation does not exist. We have rejected similar claims regarding circumstantial evidence, inferences and intent that were based on nearly identical jury instructions. See *State* v. *Otero*, 49 Conn. App. 459, 462–66, 715 A.2d 782, cert. denied, 247 Conn. 910, 719 A.2d 905 (1998); *State* v. *Johnson*, 44 Conn. App. 125, 133–37, 688 A.2d 867 (1997). We have repeatedly held that when the trial court "defined the essential mental. element for each [of the crimes charged] and unequivocally instructed the jurors that their determination of those elements was to be guided by the standard of reasonable doubt . . . there [was] no substance to the defendant's claim that the jury instructions failed to inform the jurors that the state bore the burden of proving the facts essential to establish each element of the crimes beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Otero*, supra, 466–67; see also *State* v. *DeJesus*, supra, 260 Conn. 475.

The court's instruction repeated that the state must prove beyond a reasonable doubt each and every element necessary to constitute each of the crimes charged. The court also defined the required mental state for each crime and instructed the jurors that their determination of those elements must be guided by the reasonable doubt standard. On the basis of the court's repeated instruction regarding the standard of proof beyond a reasonable doubt, it is difficult to believe that the jury could have been misled on the issues of intent and circumstantial evidence.

Further, we have stated that when a group of facts is relied on to prove an element of a crime, such as intent, the cumulative impact, rather than each individual fact, must meet the standard of proof beyond a reasonable doubt. *State* v. *Otero*, supra, 49 Conn. App. 466. The court's instruction to the jury to consider *all*

of the evidence in the light of reason, experience and common sense was proper.

Accordingly, the court properly charged the jury on circumstantial evidence and did not improperly lower the state's burden of proof beyond a reasonable doubt on the element of intent.

The judgment is affirmed.

In this opinion the other judges concurred.