STATE OF CONNECTICUT *v.* WAYNE JONES[1]
(AC 28642)

Bishop, Gruendel and Borden, Js.

[1] In an effort to protect the privacy interests of the victims of sexual assault, we ordinarily decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e. The defendant's identity is provided in the present case because the defendant is not someone through whom the victim could be identified. Although the defendant lived on the first floor of the same two-family house as the victim, this connection is not close enough to justify the redaction of the defendant's name pursuant to § 54-86e.

Argued January 21—officially released July 14, 2009

*Stephanie L. Evans*, special public defender, for the appellant (defendant).

*Frederick W. Fawcett,* supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, *Cornelius P. Kelly,* senior assistant state's attorney, and *Christopher Hayes,* law student intern, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Wayne Jones, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1),[2] burglary in the first degree in violation of General Statutes (Rev. to 2005) § 53a-101 (a) (2)[3] and kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B).[4] He claims that (1) the trial court improperly denied his motion to suppress evidence obtained by a search warrant because the warrant was based solely on suspicion and conjecture rather than probable cause, (2) the prosecutor committed impropriety during closing arguments to the jury and (3) the defendant was denied his right under the confrontation clause of the federal and state constitutions to cross-examine the victim effectively. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 24, 2005, the victim, B, was living in

[2] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person . . . or by the threat of use of force against such other person . . . which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[3] General Statutes (Rev. to 2005) § 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

[4] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to . . . (B) accomplish or advance the commission of a felony . . . ."

Stratford with her fiance, H. B and H lived in the second floor apartment of a two-family house. H was employed at a local methadone maintenance clinic as a counselor and generally worked from 6 a.m. to 2 p.m. On the morning of August 24, 2005, H left for work about fifteen to twenty minutes before 6 a.m., and when he departed, he locked the back door.

After H left their apartment, B, who had fallen back to sleep, woke up to find the defendant standing over her. Thinking it was her fiance returning from work, however, B reached up and touched the defendant's arm and asked if something was wrong. The defendant told B to "shut up," pushed her down onto the bed and put his hand over her mouth, at which point B realized the man was not her fiance. B kicked at the defendant, who then put his arm around her neck. As B tried to break free, the defendant tightened his grip around her neck. At this point, B became aware that the defendant was bare-chested and had a towel over his head. Realizing that the more she fought with the defendant, the tighter his grip became around her neck, B stopped fighting. The defendant then told B to get on the bed, as both B and the defendant had fallen to the floor during the struggle. B got on the bed face down while the defendant stayed behind her with his arm around her neck.

The defendant then began questioning B. He asked with whom B lived, and she responded, H. The defendant told B that H owed him money for drugs, which he had sold to H several months earlier, and that he was there to "rough up" B so that H would pay him. Although B did not believe the defendant, she told him that she would make sure that H paid him. The defendant told B that H had left the door open and that the defendant had been checking it. He also told B that he was not going to hurt her because now that he had seen her, "he seen what he liked." The defendant then

asked B if she knew the man who lived downstairs, and she said that she did not. The defendant repeatedly asked her this question, and she continued to answer that she did not know the man living downstairs. The defendant told B that the man downstairs saw the defendant drive by and was outside smoking a cigarette and washing his car. He said that the man looked smart and could give the police a description of him.

The defendant then asked B if she loved H, and she replied that she did. The defendant also told B that his gang could get to H anytime it wanted to and that he could kill her but would not do so if B gave him "some." B understood that the defendant meant having sex with him. The defendant had his weight at the back of B's neck and his elbow pressed into her jaw. She believed that he could break her neck at any time, so she did not resist him. The defendant asked if B would call the police, and she assured him that she would not.

B then felt the defendant penetrate her vagina with his fingers. She then felt the defendant wipe her vagina with a tissue. She heard paper ripping and thought that the defendant was getting a condom. She felt the defendant penetrate her vagina again. Throughout the assault, B never had an opportunity to see the defendant's face.

The defendant then put B in the bedroom closet and told her to count to 100. B kept her eyes closed because the defendant was concerned about being recognized, and she did not want him to think she could identify him. As B was counting, she heard what she described as bare feet on the kitchen floor and heard the back door open and close. Once she heard the door shut, B ran from the closet to the back door. She was unable to see out the back door window because it was covered in plastic. B then hurried into the bathroom, which was located adjacent to the back door, and looked out the bathroom window. B heard someone running down the

exterior wooden backstairs and then heard the door of the first floor apartment close. She did not observe any cars leaving the area or see anyone running away from the residence. B then called H on her cellular telephone. She also noticed that one of her fingernails was broken and thought that she may have scratched her attacker because it was not broken prior to the incident.

B was hysterical and crying when she called H. H left work and drove home. Once home, B told H that she had been sexually assaulted in the bedroom, but she could not identify her attacker. H went downstairs to talk to the residents of the first floor apartment, which included Anika Allen, her daughter and the defendant. H spoke with the defendant, who was in his underwear and not wearing a shirt or shoes. H told the defendant that his fiance had just been raped and asked if the defendant had heard anything. The defendant replied that he had not heard anything and knew nothing.

As H was leaving the first floor apartment, Stratford police Officer Curtis Eller arrived. Eller spoke to H and then went upstairs to speak to B. B told Eller that immediately after the assault she heard footsteps going down the backstairs and then heard the first floor apartment door close. Eller then spoke with the defendant outside his apartment. The defendant was not wearing a shirt or shoes and told Eller that he did not hear anything. After this conversation, Eller went to St. Vincent's Medical Center in Bridgeport (hospital), where B had been transported, and spoke to her again. B gave Eller a description of her attacker. She described her attacker as approximately five feet, nine inches tall with a muscular build, a brown complexion and hair on his chin, and as having breath that smelled of cigarette smoke. Eller then returned to the scene.

When Detective Richard Yeomans of the Stratford police department arrived at the scene, he first spoke

with H and then went to the first floor apartment to speak with the defendant. Yeomans noticed that the defendant was wearing white boxer shorts but was not wearing a shirt or shoes. Yeomans also noticed that the defendant had a fresh scratch on his left elbow. Yeomans then spoke with Eller, who relayed his conversation with B to Yeomans. Yeomans testified that the defendant fit B's description, so he went back to the defendant's apartment and asked the defendant if he smoked, and the defendant replied that he did. The defendant then became upset and accused Yeomans of calling him a suspect. Yeomans explained that he was a potential witness. The defendant responded: "I may be from the hood, but I'm not dumb, I'm smart." The defendant then told Yeomans that he did not attack B.

While at the hospital, an emergency room physician, Frank Illuzzi, treated B. Illuzzi performed a genital examination and found a one inch tear between B's external and internal labia, which, in his opinion, indicated forced sexual intercourse. A sexual assault evidence collection kit (kit) was administered, which included, among other things, a vaginal smear and swab and a blood sample. The kit was submitted to the state forensic science laboratory (laboratory) for analysis. The results of the kit were examined by a criminalist, Karen Lamy, in the forensic biology section of the laboratory. Lamy found spermatozoa[5] on the vaginal swab during her examination.

The results of the vaginal swab analysis were given to Yeomans, who, upon receipt of this information, secured a search and seizure warrant to take a DNA sample of the defendant via an oral swab.[6] Pursuant to the warrant, on October 29, 2005, Yeomans obtained

[5] As Lamy explained in her testimony, spermatozoa is the male reproductive cell that indicates the presence of semen.

[6] Police officers also obtained an oral swab from H during their investigation.

an oral swab containing a DNA sample from the defendant at the Stratford police station, which was sent to the laboratory for testing. The defendant again told Yeomans that he did not sexually assault B and never had intercourse with her. The defendant left the police station, however, before Yeomans could give him a copy of the search warrant.

Yeomans was able to give the defendant a copy of the search warrant on November 11, 2005. The defendant again told Yeomans that he did not sexually assault B, but that his cousin, Dwayne White, had assaulted B. Upon learning of this information and further investigating the matter, Yeomans applied for and received a search and seizure warrant to obtain a DNA sample of White via an oral swab. Thereafter, a DNA sample from White was obtained and submitted to the laboratory for testing.

Christine Roy, a forensic science examiner at the laboratory, performed the analysis of the vaginal swab and the DNA samples taken from B, H, the defendant and White. See footnote 7. Roy determined that the contributors to the DNA profile found on the sperm rich fraction of the vaginal swab included B, H and the defendant.[7] White was eliminated as a contributor to the DNA profile. The results of Roy's analysis were submitted to the Stratford police department.

Thereafter, the defendant was arrested and charged with one count of sexual assault in the first degree in violation of § 53a-70 (a) (1), one count of burglary in the first degree in violation of § 53a-101 (a) (2) and one count of kidnapping in the first degree in violation of § 53a-92 (a) (2) (B). At the close of the state's case-in-chief, the defendant moved for a judgment of acquittal on all counts, which the court denied. Thereafter, the jury found the defendant guilty on all three counts, and

---

[7] See discussion in part II B.

the court rendered judgment accordingly. This appeal followed.

I

The defendant first claims that the court improperly denied his motion to suppress evidence obtained by a search warrant because the warrant was based solely on suspicion and conjecture rather than probable cause. We disagree.

The following additional facts and procedural history are relevant to our disposition of the defendant's claim. After interviewing B, H and the defendant, and after receiving the results of the vaginal swab, Yeomans and Detective William Perillo, another member of the Stratford police department, executed an affidavit and application for a search and seizure warrant for a sample of the defendant's DNA. The following information was contained in the affidavit.

On August 24, 2005, officers from the Stratford police department responded to a two-family home in Stratford to investigate a report that a female had been sexually assaulted in the residence. The victim was in bed when she was attacked by a black male wearing dark colored sweat pants, a towel over his head and no shirt or shoes. The male grabbed the victim around the neck, choked her and then forced his penis into the victim's vagina, sexually assaulting her. The victim broke a fingernail trying to scratch the male as he was attacking her.

The victim described her attacker as a black male of medium height and muscular build with a medium brown complexion. The victim stated that the male sexually assaulted her from behind, his face was very close to her head and she could feel that the male had long hair on his chin. The male also asked her questions about the people who lived on the first floor. The male

asked the victim if she knew the boyfriend of the female who lives in the first floor apartment, and the victim stated that she did not. The male then told the victim that the boyfriend from the first floor apartment was outside smoking a cigarette and washing his vehicle. The male then told the victim that if she called the police the boyfriend from the first floor apartment would be able to say he saw him because the boyfriend looked smart.

After the male sexually assaulted her, he forced her into a closet located in the bedroom. While in the closet, the victim could hear the male walking on the kitchen floor, and it sounded like the male was barefooted. Once she heard the male exit the rear door of her apartment, she opened the closet door and ran to the rear door. While standing at the rear door she could hear the male running down the rear exterior wood stairs. The victim stated that she locked the door and then went into the bathroom, which is located next to the rear door, and looked out the bathroom window, which was open. The victim stated that she had a view of the rear of the house and of the street, which is next to the house. She did not see anyone running from the house or any vehicles leaving the area. Furthermore, as she was looking out the bathroom window, she heard the rear door to the first floor apartment, which is below the bathroom window, slam shut.

During the initial police investigation, residents of the first floor apartment of the two-family house were interviewed, including the defendant. During the interview, the defendant stated that he was the only adult male in the apartment at the time. The defendant is a black male with a light brown complexion and has a goatee style beard with hair that is one-and-a-half to two inches long. He was not wearing a shirt and was barefooted during the interview. He had what appeared to be a fresh scratch mark on his left arm in the area

of his elbow. The defendant stated that he was up all night watching movies but that he did not hear or see anything. In response to a question asked by Yeomans, the defendant admitted that he smokes cigarettes. Yeomans then asked if the defendant had been outside early in the morning smoking a cigarette. The defendant became upset and stated that Yeomans was accusing him of being a suspect. When Yeomans explained to the defendant that he was interviewing him as a possible witness, he accused Yeomans of questioning his intelligence. The defendant then stated, "I may be from the hood, but I'm not stupid, I'm smart."

Before trial, the defendant filed a motion to suppress any evidence derived from his DNA sample on the ground that there had been no probable cause to issue the search warrant. During a hearing on the matter, the defendant contended that the search warrant was invalid because it did not show probable cause. More specifically, the defendant asserted that there were insufficient facts presented in the warrant to justify a search and seizure of him, given that the victim's description of the perpetrator was simply that he was a black male, with a goatee, who smokes cigarettes, and that she did not see the perpetrator and only heard footsteps running down the backstairs and the back door slam shut. The court subsequently denied the motion to suppress.

At the outset of our analysis, we set forth the proper standard of review. "The fourth amendment to the United States constitution provides in relevant part that no warrants shall issue, but upon probable cause . . . . We uphold the validity of [a search] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the magistrate's conclusion that probable cause existed. . . . [T]he magistrate is entitled to draw reasonable inferences from the facts presented. When a magistrate has determined that the warrant affidavit

presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the magistrate. Whe[n] the circumstances for finding probable cause are detailed, whe[n] a substantial basis for crediting the source of information is apparent, and when a magistrate has in fact found probable cause, the reviewing court should not invalidate the warrant by application of rigid analytical categories. . . .

"Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . In determining the existence of probable cause to search, the issuing magistrate assesses all of the information set forth in the warrant affidavit and should make a practical, nontechnical decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . Probable cause, broadly defined, [comprises] such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." (Internal quotation marks omitted.) *State* v. *Grant*, 286 Conn. 499, 510–11, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008).

"Whether the trial court properly found that the facts submitted were enough to support a finding of probable cause is a question of law. . . . The trial court's determination on [that] issue, therefore, is subject to plenary review on appeal." (Internal quotation marks omitted.) Id., 510.

We conclude that there were sufficient facts presented in the affidavit accompanying the search warrant

application to support a finding of probable cause. The judge who issued the warrant properly could infer from the facts presented in the affidavit that (1) B had been sexually assaulted; (2) the defendant matched the physical description of the perpetrator given by B; (3) B broke her nail as she scratched the perpetrator and that the perpetrator would have a fresh scratch on his body like the one the affiants observed on the defendant's left arm; (4) the perpetrator lived in the first floor apartment of the two-family house in which B was assaulted, as B heard footsteps down the back stairwell, heard the first floor door slam shut and did not see anyone running or driving away from the residence; (5) the defendant was the only adult male resident of the first floor apartment; (6) the defendant admitted that he was home at the time of the crime; and (7) the perpetrator's repeated references to the downstairs neighbor exhibited an unusual interest in, and thereby a connection between, the perpetrator and that neighbor. These facts and inferences were sufficient to establish probable cause that the defendant was the perpetrator.

The defendant argues, nonetheless, that, to support the conclusion that there was probable cause to issue a search warrant, the affidavit was required to show that the defendant's DNA profile "[would] match that of the perpetrator . . . ." The defendant's contention is incorrect. To establish probable cause to obtain a DNA sample from the defendant, the state was not required to present facts sufficient to support a reasonable belief that it was more likely than not that the semen found belonged to defendant; much less than that was needed. See *State* v. *Grant*, supra, 286 Conn. 516 n.10; see also *Illinois* v. *Gates*, 462 U.S. 213, 244 n.13, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) ("probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity"). The state, as it correctly argues, had to establish

only that the evidence sought was connected with criminal activity or would aid in a specific arrest or conviction, and that there was a fair probability that evidence of a crime would be found in the place to be searched. *State* v. *Grant,* supra, 510–11.

Here, the affidavit established that a sexual assault was committed, that the defendant was connected to the sexual assault and that the defendant's DNA would assist in an arrest or conviction. Thus, there was probable cause to support the search warrant. Accordingly, the court properly denied the defendant's motion to suppress.

## II

The defendant next claims that the prosecutor engaged in impropriety during closing arguments to the jury.[8] The defendant asserts that during rebuttal, the prosecutor made several improper comments regarding the police investigation and the DNA evidence. We disagree.

---

[8] At trial, the defendant did not object to the instances of prosecutorial impropriety he now raises on appeal. The defendant, therefore, seeks to prevail under *State* v. *Stevenson,* 269 Conn. 563, 849 A.2d 626 (2004). In *Stevenson,* our Supreme Court clarified that in cases involving prosecutorial impropriety, "it is unnecessary for the defendant to seek to prevail under the specific requirements of *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial impropriety is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams,* 204 Conn. 523, 540, 529 A.2d 653 (1987). As we stated in that case: 'In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case.' " *State* v. *Stevenson,* supra, 572–73.

We begin our analysis by setting forth the applicable law regarding claims of prosecutorial impropriety. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[T]he touchstone of due process analysis in cases of alleged [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's [actions] in the context of the entire trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007).

"In determining whether an impropriety has occurred in closing arguments, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Felix*, 111 Conn. App. 801, 807, 961 A.2d 458 (2008).

With these principles in mind, we review the defendant's claims. Additional facts will be set forth as necessary.

A

The defendant contends that the prosecutor committed prosecutorial impropriety when he stated: "Do you want your—the police department to have certain hunches?" The defendant asserts that this comment was inappropriate because "it implies that the jury should consider the importance of permitting the police to act on hunches, as well as the consequences that could occur if they do not act on their hunches." We disagree.

During the trial, the jury heard testimony from Yeomans, who explained his investigation of the defendant. Yeomans testified that when he arrived on the scene of the crime, he first met with H, who provided Yeomans with the information that B had given H about the sexual assault, because B had been transported to the hospital. Yeomans then went to talk to the people living in the first floor apartment, including the defendant, who claimed that he did not see or hear anything. After this initial conversation with the defendant, Yeomans had the opportunity to talk to Eller, who relayed to Yeomans the description of the perpetrator that he received from B while at the hospital. Because the description of the perpetrator given by B matched the defendant, Yeomans returned to the first floor apartment to question the defendant for a second time. During his second conversation with the defendant, Yeomans asked the defendant if he smoked because B had described the perpetrator as smelling of cigarette smoke. The defendant admitted that he did smoke and then became upset and accused Yeomans of calling him a suspect and "thinking he was dumb." Yeomans told the defendant that he was not a suspect but a potential witness.

During closing arguments, the defendant argued that Yeomans rushed to judgment in treating the defendant as a suspect. The defendant asserted that Yeomans failed to investigate other leads and that the defendant was a suspect from the beginning despite Yeomans' testimony to the contrary.

We conclude that the comment made by the prosecutor referring to the hunches of police officers was a proper and a fair response to the defendant's assertion that Yeomans rushed to judgment in treating the defendant as a suspect. The prosecutor merely was asking the jury to draw a reasonable inference that on the basis of Yeomans' conversation with H and Eller on the day of the incident, the defendant was a suspect who should be investigated further, which is why Yeomans interviewed the defendant a second time.

## B

The defendant argues that the prosecutor committed impropriety because he consistently mischaracterized the DNA evidence in such a way that the jury was misled to believe that the evidence had proven that the DNA observed in the victim's vaginal swab was from the defendant. We disagree.

During her direct testimony, Roy stated that she started her analysis of the DNA evidence with a differential extraction of the vaginal swab to obtain an epithelial rich fraction and a sperm rich fraction. The goal of the differential extraction is to isolate the sperm cells from the epithelial cells, which are cells from the person who was swabbed, in this case, B. As Roy pointed out, however, "it is possible that this separation of epithelial [cells] from sperm [cells] is not always perfect." In other words, sometimes the sperm rich fraction will contain epithelial cells and vice versa. Roy explained that the epithelial rich fraction she examined contained B's

cells, whereas the sperm rich fraction contained a mixture of both sperm cells and B's cells. Roy further explained that her examination of the DNA mixture in the sperm rich fraction indicated that at least three people contributed to the DNA profile of the sperm rich fraction of the vaginal swab.

Roy then explained the process by which the DNA profiles of B, H, the defendant and White were compared to the DNA profile of the sperm rich infraction. Roy testified that she looked at fifteen different locations on the DNA profile of the sperm rich infraction and compared the length of the DNA at each particular location to the DNA samples from B, H, the defendant and White. On the basis of her analysis, Roy concluded that B, H and the defendant were contributors to the DNA profile of the sperm rich fraction and that White was not a contributor. Next, Roy explained that she performed a statistical analysis of her findings. Roy testified that the expected frequency of individuals who could be a contributor to the DNA profile from the sperm rich fraction of the vaginal swab is approximately one in 650,000 in the African-American population, approximately one in 360,000 in the Caucasian population and approximately one in 670,000 in the Hispanic population.[9]

Later on redirect, Roy clarified her findings during the following colloquy with the prosecutor:

"Q. All right. Now, again, when you're referring to that mixture of the sperm rich fraction that you spoke of before, again, the—the profiles that appear in that sperm rich fraction are those of [B], [the defendant] and [H], is that correct?

"A. No, that's not correct, that's not what I said.

[9] Roy testified that these statistics were formulated on the basis of information contained in the Connecticut DNA database.

"Q. Okay. If you could just explain it for us, then.

"A. What I'm saying is, when I made my comparisons, [B], [the defendant] and [H] are included as contributors to that DNA profile from the sperm rich fraction of the vaginal swab."

The defendant takes issue with the following comments made by the prosecutor during rebuttal: "Where do we get [the defendant's] spermatozoa[10] . . . when it was taken from the genital opening of [B]? How did the police plant that . . . ? How did it get there? . . . But the fact of the matter [is], his sperm [was] found there"; "[If] you remove [B]. You remove [H]. Who do you have left? None other than the defendant here"; and, "How did [the defendant's] sperm get there if he wasn't in the room in the early morning hours of August 24, 2005?" The defendant claims that these comments are a mischaracterization of the DNA evidence because Roy testified only that the defendant is included as a contributor to the DNA profile of the sperm rich fraction of the vaginal swab and not that the defendant's DNA was found in the sperm rich fraction.

Although Roy did not explicitly testify that she found the defendant's DNA in the sperm rich fraction of the vaginal swab, but only that the defendant was included as a contributor, the prosecutor merely was arguing to the jury the inference that, because the defendant was included as a contributor, his DNA was contained in the DNA profile of the sperm rich fraction of the vaginal swab and, therefore, that his sperm was present in the victim's vagina. This inference was reasonable. First, Roy testified that the expected frequency of individuals who could be contributors to the sperm rich fraction in the African-American population, to which the defendant belongs, is approximately one in 650,000; thus, the jury reasonably could infer that there was an extremely

---

[10] See footnote 5.

low probability that the DNA of someone other than the defendant was contained in the DNA profile of the sperm rich fraction of the vaginal swab. In addition, Roy testified that the sperm rich fraction extracted from the vaginal swab was a mixture of *B's cells* and sperm cells. Yet, when asked by the prosecutor on redirect if the DNA found in the sperm rich fraction of the vaginal swab belonged to B, Roy testified that her analysis of the sperm rich fraction only revealed that B was included as a contributor. The jury, therefore, reasonably could infer that the defendant's DNA was present in the DNA profile of the sperm rich fraction of the vaginal swab because, like B, the defendant was identified as a contributor and, therefore, that the defendant's sperm was in B's vagina. Consequently, we conclude that the comments by the prosecutor were proper.

## III

Finally, the defendant claims that his constitutional right to cross-examine witnesses was denied because he was not allowed to inquire into H's past drug use during B's testimony. Specifically, the defendant argues that testimony relating to H's past drug use was necessary to prove that another individual had attacked the victim with the specific motive to collect on a drug debt. We disagree.

During direct examination, B testified that she and the perpetrator had a conversation, while she was being attacked, in which the perpetrator claimed that H owed him money for drugs. The perpetrator told B that H had paid him five months ago but that H had not paid him in the last three months; thus, he was there that day to "rough" her up so that H would pay. The prosecutor, thereafter, asked B if H used drugs at the time of her attack, and B replied, "No." On cross-examination, the defendant, through counsel, again questioned B as to whether H used drugs at the time of the incident, and

she again stated that he did not. He further asked B if H owed money for drugs at the time of her attack, and B responded that H did not. The defendant then asked B if H had ever used drugs prior to her attack. The prosecutor objected to this inquiry on the ground of relevance, and the defendant argued: "I think it's relevant. The door's opened, Your Honor." The court sustained the objection.

"Appellate review of evidentiary rulings is ordinarily limited to the specific legal [ground] raised by . . . trial counsel. . . . To permit a party to raise a different ground on appeal than [that] raised during trial would amount to trial by ambuscade, unfair both to the trial court and to the opposing party." (Internal quotation marks omitted.) *State* v. *Stenner*, 281 Conn. 742, 755–56, 917 A.2d 28, cert. denied, 552 U.S. 883, 128 S. Ct. 290, 169 L. Ed. 2d 139 (2007). The defendant's claim that H's prior drug use was relevant to show that another individual had attacked B was never advanced before the court. Rather at trial, the defendant simply claimed that the door was open. Therefore, the claim is unpreserved, and we decline to afford it review.

The defendant, alternatively, seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. Under the second prong, however, a defendant will not be permitted to gain review by clothing what is

essentially a mere evidentiary ruling in constitutional garb. *State* v. *Smith,* 110 Conn. App. 70, 86, 954 A.2d 202, cert. denied, 289 Conn. 954, 961 A.2d 422 (2008). We conclude that, although the record is adequate for review, the defendant simply clothes an evidentiary ruling in constitutional garb because he seeks to transform a ruling on relevancy into an issue of constitutional dimension. Rulings on the relevancy of evidence are not ordinarily issues of constitutional dimension. *State* v. *Burroughs,* 22 Conn. App. 507, 512, 578 A.2d 146 (1990).

"It is well established that a defendant has a right to introduce evidence that another person committed the offense with which the defendant is charged. . . . Third party suspect evidence is admissible if it *directly* connects the third party to the crime." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Francis,* 267 Conn. 162, 173–74, 836 A.2d 1191 (2003). Such evidence must do more than "simply [afford] a possible ground of possible suspicion against another person." (Internal quotation marks omitted.) *State* v. *Lemay,* 105 Conn. App. 486, 500–501, 938 A.2d 611, cert. denied, 286 Conn. 915, 945 A.2d 978 (2008). "The admissibility of evidence of third party culpability is governed by the rules relating to relevancy." (Internal quotation marks omitted.) Id., 501.

We conclude that the defendant's claim is not of constitutional dimension. It is, instead, merely a claim of relevance. Although evidence of H's prior drug use may have suggested that some other party may have had the motive to attack B, that would have done no more than to suggest a motive in someone else to commit the crime. See *State* v. *Francis,* supra, 267 Conn. 174. The defendant does not claim that the ruling deprived him of a viable claim of actual innocence—a claim that would be hard to make in light of the DNA evidence linking him to the crime. Thus, the defendant's

claim, stripped of its constitutional label, is merely a claim of relevancy. In the context of this case, the court's ruling on the relevancy of the information sought by the defendant's question was not of constitutional dimension.

The judgment is affirmed.

In this opinion the other judges concurred.