******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* ANTHONY PERNELL
## (AC 42470)

Lavine, Prescott and Bear, Js.

*Syllabus*

Convicted, after a jury trial, of the crime of murder in connection with the shooting death of the victim, the defendant appealed. At trial, the defendant testified, inter alia, that he and the victim were smoking phencyclidine in his bedroom while the victim exchanged a series of phone calls with her mother to arrange for a ride to work. The defendant further testified that a heated conversation ensued between the victim and her mother, that the victim subsequently took a gun from the defendant's closet and put the gun to her head, and that the gun went off when the defendant tried to take it from the victim. On appeal, the defendant claimed that he was deprived of his due process right to a fair trial because of certain prosecutorial improprieties in closing argument. *Held*:

1. The defendant could not prevail on his claim that the prosecutor improperly opined on how someone should act during a police interview because there was no evidence as to how a grieving person typically would respond when questioned by the police hours after witnessing his friend's death, nor about how the defendant's ingestion of phencyclidine could have affected his behavior during the police interview; the prosecutor, who merely asked the jurors to consider the defendant's demeanor during the police interview and argued the inference that he was calm during that interview, properly prompted the jurors to employ their common sense in considering the evidence, and he simply observed that the defendant was calm and calculating at the time of the police interview, which the jurors reasonably could have inferred from the video of the police interview that was entered into evidence.

2. The defendant's claim that the prosecutor improperly interjected his own experience by stating what he would have done if he had found himself in the defendant's circumstances was unavailing; the challenged comment of the prosecutor was not an improper personal anecdote and was based squarely on the evidence that was heard by the jury, including the defendant's testimony that he failed to answer the victim's cell phone when her mother called after the shooting, as well as his testimony regarding the victim's heated conversation with her mother that led to her supposedly picking up the gun and holding it to her head to attempt suicide, and the prosecutor's statement about what he would have done did not indicate that the statement was based on the prosecutor's own experience and was the rough equivalent of asking the jurors what they would have done in the defendant's shoes after the shooting.

3. The defendant could not prevail on his claim that the prosecutor improperly appealed to the jurors' emotions when the prosecutor speculated that the defendant went through the victim's purse after her death and found letters regarding child custody issues; the prosecutor's comment was a proper response to an inference raised by defense counsel that a letter from the victim's child custody attorney in the victim's purse corroborated the defendant's story that the victim was suicidal and trying to kill herself because of child custody issues, and there was sufficient evidence in the record to support the inference that the defendant went through the victim's purse, including the defendant's affirmative efforts to portray the victim's death as a suicide, as well as the time and opportunity he had to do so after the shooting and before the police arrived.

4. The defendant could not prevail on his claim that the prosecutor's statement that the defendant's version of the events, namely, that the gun was in both his and the victim's hands at the time of discharge, contradicted the gunshot residue evidence was improper because it was not properly derived from the evidence presented; although the gunshot residue expert did not state with absolute certainty that the victim's hands could not have been on the gun at the time of discharge, it was reasonable for the jury to infer that the victim did not have her hands

on the gun at the time of discharge due to the lack of gunshot residue on her hands, and, thus, the prosecutor properly argued a fair inference from the evidence to the jury.

5. The defendant's claim that the prosecutor's use of the words "kill shot" improperly appealed to the jurors' sympathies and emotions because those words implied more than mere murder was unavailing, as the words used were factually accurate and supported by the evidence that the victim was in fact killed by a gunshot to her forehead, and the evidence presented supported the inference that the victim's death was intentionally caused by the defendant.

6. Although the prosecutor improperly appealed to the jurors' sympathies by using the word "executed" and improperly expressed his personal opinion by making the statement that "[i]t's shameful" that the defendant went through the victim's purse after her death, those improprieties did not deprive the defendant of his due process right to a fair trial; the prosecutorial improprieties were not so serious as to amount to a denial of due process, as defense counsel invited the prosecutor's use of the words "[i]t's shameful," the improprieties were not severe because defense counsel did not object and the use of the words "executed" and "[i]t's shameful" was not blatantly egregious in light of the facts before the jury, the improprieties were infrequent because they consisted of a few words following three full days of evidence, the statement "[i]t's shameful" was not central to a critical issue in the case, the curative measures employed by the court, including instructions to the jury on multiple occasions throughout both the trial and closing argument that closing argument was not to be considered as evidence, were adequate, and the state's case was strong enough so that it was not reasonably likely that the jury's verdict would have been different if the prosecutor had not used the word "executed" and the phrase "[i]t's shameful."

Argued September 5—officially released November 19, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of murder, possession of narcotics with intent to sell and criminal possession of a revolver, brought to the Superior Court in the judicial district of Hartford, where the defendant entered a plea of guilty to the charges of possession of narcotics with intent to sell and criminal possession of a revolver; thereafter, the charge of murder was tried to the jury before *D'Addabbo, J.*; subsequently, the court denied the defendant's motion for a judgment of acquittal; verdict of guilty; thereafter, the court denied the defendant's motion for judgment notwithstanding the verdict; judgment of guilty in accordance with the verdict and plea, from which the defendant appealed. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Anthony Pernell, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a. On appeal, the defendant claims that the prosecutor committed prosecutorial improprieties in his closing argument, which deprived the defendant of his due process right to a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In March, 2015, the defendant; his mother, Gail Grant (mother); and half brother, Christopher Grant (Grant), resided in a three bedroom apartment located at 48 Congress Street in Hartford (apartment). On March 17, 2015, the defendant and Lilliana Restrepo, the victim, were together in the defendant's bedroom smoking phencyclidine (PCP) while the victim got ready for work. When the victim went to leave for work, the defendant shot her with a revolver (gun) at close range in the center of her forehead.

The defendant was taken into custody and interviewed by the police.[1] The defendant told the police that the victim was his friend. He stated that the victim was stressing about her son and that she wanted to kill herself because the Department of Children and Families took her son away. The defendant stated that he took the gun out of a bag to show the victim, and she was playing with it. The defendant said that he tried to stop her, but he accidentally pulled the trigger when he grabbed the gun from her. He claimed that it went off because the victim already had cocked the gun. The defendant stated that he was standing in front of the victim when the gun went off. He also stated: "I wasn't giving her the gun when I shot her in the head. . . . I tried grabbing the gun from her . . . and the shit went off. I told you, it's kind of . . . man, that's why I said it, it was just kind of strange. And then . . . I feel like they probably wouldn't believe . . . me . . . that's why I kind of . . . made it look like she killed herself. . . . Like, actually she had the gun aimed, I grabbed. . . . Do you understand what I'm saying?" The defendant admitted that he put the gun in the victim's hand to make it look like she shot herself. He also admitted that he did not call an ambulance after the victim was shot.

The detectives attempted to take the defendant's written statement. During that discussion of the events, the defendant stated: "I was dirty with drugs . . . basically that's why I came up with this story. . . . I just don't want to get involved in this shit at all. I was trying to keep myself cleared . . . because I had drugs on me," and "I just said that because I had the drugs on me. . . . I don't know really what happened. I came and checked my phone . . . I went outside to make a cou-

ple [drug] sales. I came back, and I found her like that." The defendant claimed that he told the police that he had shot the victim to cover up that he had drugs on his person. After that exchange, the detectives left the interview room. In their absence, the defendant knocked on the interview room door and, when the detectives opened the door, the defendant said: "I just want to tell you guys the truth, man, because I know you won't believe me . . . . I grabbed the gun by accident, man. I know y'all wouldn't believe me, man." The defendant claimed that this was the truth.

The defendant was arrested and charged with murder, possession of narcotics with intent to sell, and criminal possession of a revolver.[2]

Both the defendant and Grant testified at trial. Their respective testimonies are relevant to our evaluation of the defendant's claims on appeal and are, therefore, summarized herein. The defendant testified that when he and the victim were smoking in his bedroom, the victim exchanged a series of phone calls with her mother to arrange for a ride to work. After the victim told her mother that she would find her own ride to work, a heated conversation ensued between the victim and her mother. The defendant further testified that the victim asked him if he would be there for her as a friend, and that she also expressed that she was getting emotionally close to the defendant. The defendant testified that the victim said she felt stupid and ugly, and so the defendant told her that he would be there for her in the best way that he could. The defendant testified that, after that exchange, the victim stated that "she was tired of everybody" and started texting. At that time, the defendant testified that he looked for a CD-ROM to play to calm her down because she was aggravated from the phone call and disappointed that the defendant did not realize how she felt toward him emotionally. The defendant further testified that the victim, who the defendant called Lill, took a gun from the defendant's closet and that: "I said, what you got in your hand? I'm like, Lill, and this is what I said, what the fuck are you doing? She like, no, I'm tired. . . . You ain't right. . . . I said, what you talking about? Then, at this time, I'm standing up because she got a gun in her hand and thought . . . maybe she [was] going to shoot me or she might kill herself . . . ." The defendant continued: "I ask her, what the fuck she doing. She just said she was tired of everybody and I'm not right. And I said, Lill, what you doing? She kicked the handle back. I said, Lill, you can't do this. We in my mother's house. I said, we all go to jail if you do this. At this time, she started putting the gun up like this, and I got closer. By the time she had it to her head, I pulled it back, she put it in the other hand and it went off. And then it dropped." The defendant testified that he paced in his room, and that he then picked the gun up and put it on his bed. Then he went into Grant's

adjacent bedroom and woke him up.

Grant testified that the defendant and the victim were friends, and that their relationship may have been sexual in exchange for drugs. Grant testified that on the day of the shooting, the defendant came into his room, woke him from sleep, and said that he had done something wrong and shot the victim. Grant further testified that he asked the defendant if he was joking, and the defendant could not clarify, and so the defendant told Grant to go in the next room and look for himself. They went into the defendant's bedroom together, where Grant observed the victim lying with her head back in a basket. Grant testified that he checked the victim's pulse on her left arm. He testified that the defendant then "showed me that he had shot her" and that "[b]ecause her face was facing the other direction to the side, I didn't see the bullet wound at first, and he showed me that it was there." It was at that time that Grant learned that the victim was dead. Grant asked the defendant what happened, but the defendant could not answer him. They stayed in the defendant's bedroom for about fifteen minutes. Grant testified that, after fifteen minutes, they stepped into the hallway, where they stayed for twenty to forty minutes. After that time, the defendant went back into the bedroom to try and wake the victim up. Grant had to pull the defendant off the victim and close the door to the bedroom. Grant testified that the defendant then received a call to make a drug sale and that he left the apartment.

When the defendant returned from his drug sale, Grant testified that he and the defendant made their way back to the defendant's bedroom. According to Grant, the defendant suggested at that time that "he makes it look like a suicide." Grant told the defendant that that would not be the right thing to do, and he turned away from the defendant's bedroom. The defendant testified that, when Grant left the bedroom, "I sat on the bed, and I started thinking, just started looking at her. I didn't know what to do. I just sit there for a minute and then my mind start racing like, man, when I tell them this, they ain't never going to believe me. So, I just started clicking like, I said, man, my story, they ain't going to believe this, so I put the gun in her hand to make it look like what it was. I tried to grab, but it went off." The defendant further testified that he saw that the victim's mother was calling the victim's cell phone again, but he did not answer the phone. The defendant removed the cell phone from the victim's hand and placed the gun in her hand.

Grant called his girlfriend, mother, and uncle, and his mother called the police. The responding police officer, Dominick Agostino, testified that, upon entering the apartment, he heard Grant on the telephone stating: "He shot her. He shot her. I can't believe this." Agostino observed the defendant frantically scan the area and

look for a place to escape but was unable to do so.

On the basis of the evidence presented at trial, the jury found the defendant guilty of murder in violation of § 53a-54a, and the court accepted the jury's verdict. The defendant was sentenced to a term of fifty years of incarceration. This appeal followed. Additional facts will be set forth as necessary.

On appeal, the defendant claims that the state violated his due process right to a fair trial when the prosecutor committed six separate improprieties during closing argument. He argues that the prosecutor expressed personal opinions, discussed facts not in evidence, and appealed to the jurors' emotions. The defendant contends that his intent when the victim was shot was "the key issue in this case," and that the claimed improprieties were harmful because the state's case was weak. The state concedes that two of the prosecutor's statements were improper but argues that they did not deprive the defendant of his due process right to a fair trial. We conclude that, notwithstanding the state's concessions, even if two of the prosecutor's remarks were improper, they did not deprive the defendant of his due process right to a fair trial.

We first set forth the relevant legal principles governing our review.[3] It is often said that "[w]hile [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." (Internal quotation marks omitted.) *State* v. *Rowe*, 279 Conn. 139, 159, 900 A.2d 1276 (2006), quoting *Berger* v. *United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935).

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include: [1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to

the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 560–61, 34 A.3d 370 (2012). "The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Internal quotation marks omitted.) *State* v. *Ross*, 151 Conn. App. 687, 700, 95 A.3d 1208, cert. denied, 314 Conn. 926, 101 A.3d 271 (2014). "Under the *Williams* general due process standard, the defendant has the burden to show both that the prosecutor's conduct was improper and that it caused prejudice to his defense." *State* v. *A. M.*, 324 Conn. 190, 199, 152 A.3d 49 (2016). "The two steps of [our] analysis are separate and distinct, and we may reject the claim if we conclude [that] the defendant has failed to establish either prong." *State* v. *Danovan T.*, 176 Conn. App. 637, 644, 170 A.3d 722 (2017), cert. denied, 327 Conn. 992, 175 A.3d 1247 (2018).

I

PROSECUTORIAL IMPROPRIETY

The defendant claims that the prosecutor made six improper remarks in closing argument. More specifically, the defendant claims that the prosecutor improperly (1) opined on how someone should act during a police interview; (2) opined on what the prosecutor would have said to the victim's mother when she called; (3) speculated that the defendant might have gone through the victim's purse and shamefully blamed her death on her child custody problem; (4) asserted that the defendant's version of the events conflicted with the gunshot residue evidence; (5) stated that the victim was "dead in the defendant's bedroom with a kill shot to her forehead"; and (6) argued that the victim was "executed." We address each of these remarks in turn to determine whether the prosecutor committed impropriety in his closing argument.

A

On appeal, the defendant claims that the prosecutor improperly opined on how someone should act during a police interview because there was no evidence as to how a grieving person typically would respond when questioned by the police hours after witnessing his friend's death and also because there was no evidence about how the defendant's ingestion of PCP could have affected his behavior during the police interview.[4] The defendant argues that the remark may have caused the jury to assume that the defendant did not behave appropriately because the prosecutor's question as to whether the defendant seemed upset presupposed that only a guilty person would calmly answer police questions. We disagree.

The defendant's claim is fundamentally flawed because the prosecutor did not offer the opinions that the defendant asserts that he did. The challenged statements are not improper because the prosecutor merely asked the jurors to consider the defendant's demeanor during the police interview and argued the inference that the defendant was calm during that interview. Counsel is not prohibited from asking the jurors questions that prompt them to employ their common sense in considering the evidence. "[J]uries are not required to leave common sense at the courtroom door . . . ." (Internal quotation marks omitted.) *State* v. *Lopez*, 93 Conn. App. 257, 267, 889 A.2d 254 (2006), aff'd, 281 Conn. 797, 917 A.2d 949, aff'd sub nom. *State* v. *Kennedy*, 281 Conn. 801, 917 A.2d 947 (2007). "[J]urors, in deciding cases, are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to a jury's common sense in closing remarks." (Internal quotation marks omitted.) *State* v. *Elmer G.*, 176 Conn. App. 343, 376, 170 A.3d 749 (2017), aff'd, 333 Conn. 176, 214 A.3d 852 (2019). Furthermore, the declaratory statements contained within this challenged remark—"Seems awful calm when he was interviewed by the police hours later. It also seems that every question presented to him was coolly and with calculation responded to."—are inferences reasonably drawn from the video of the police interview that was entered into evidence. "[I]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 583, 849 A.2d 626 (2004). The jurors reasonably could have inferred from the video of the police interview that the defendant, as asserted by the prosecutor, was calm, cool, and calculating at the time of the interview. Our review of the evidence supports the prosecutor's argument that the defendant was not agitated or upset during the course of his time in the interview room. To the contrary, he slept and ate macaroni and cheese when he was alone, and offered the detectives multiple, differing stories with respect to how the victim was shot. The defendant even told the police, during his interview, which the jury heard, that he "came up with this story." Because the prosecutor properly prompted the jurors with questions to consider the evidence and simply observed that the defendant was calm and calculating at the time of the police interview, we conclude that this statement was not improper.

B

The defendant next claims that the prosecutor improperly interjected his own experience by stating

what he would have done if he had found himself in the defendant's circumstances.[5] In support of this claim, the defendant cites to *State* v. *McCarthy*, 105 Conn. App. 596, 630–31, 939 A.2d 1195, cert. denied, 286 Conn. 913, 944 A.2d 983 (2008), a case in which this court held that the prosecutor's attempt to attack the defendant's photographic evidence by referring to a personal experience—a failed attempt to accurately photograph a bird—was improper because there was no evidence at trial to establish that the cameras used by investigators for the defense produced disappointing results. In the present case, the prosecutor argued that the defendant did not answer the cell phone call from the victim's mother following the shooting because he murdered the victim and was in "protection mode." In making this argument, he highlighted the defendant's testimony that the victim was suicidal after having a heated conversation with her mother and stating that she was tired of everybody. The prosecutor continued: "Now, ask yourselves . . . can you put yourselves in that position? . . . I . . . would have a few choice words for her mother at that point in time if I just witnessed my friend killing herself or dead after having tried to [kill] herself." We are not persuaded by the defendant's claim that such a statement constituted an improper personal anecdote, as was the case in *McCarthy*. In the present case, the prosecutor's statement was based squarely on the evidence that was heard by the jury, including the defendant's testimony that he failed to answer the victim's cell phone when her mother called after the shooting, as well as his testimony regarding the victim's heated conversation with her mother that led to her supposedly picking up the gun and holding it to her head to attempt suicide.

The defendant's argument seems to imply, however, that the prosecutor's mere use of the words "I . . . would have" indicates that the statement was based on the prosecutor's own experience. We disagree. "The [prosecutor] should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he [or she] is simply saying I submit to you that this is what the evidence shows, or the like." (Internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 583–84. In *State* v. *Bell*, 283 Conn. 748, 773, 931 A.2d 198 (2007), our Supreme Court concluded that it was not improper for the prosecutor to ask the jurors to put themselves in the defendant's shoes to evaluate how a reasonable person would act under the circumstances. In the present case, the prosecutor's statement about what he would have done was the rough equivalent of asking the jurors what they would have done in the defendant's shoes after the shooting. We, therefore, conclude that this statement did not constitute prosecutorial impropriety.

C

The defendant claims that the prosecutor improperly speculated that the defendant "shameful[ly]" went through the victim's purse after her death and found letters regarding child custody issues. The defendant also claims that this statement improperly appealed to the jurors' emotions. We disagree with the defendant.

The context of closing argument in this case is relevant to the analysis of this claim and is, therefore, summarized herein. The prosecutor argued in closing that the defendant's story—that the victim was suicidal and trying to kill herself—was fabricated. The prosecutor supported that argument with the inconsistencies between the defendant's statements to the police and his testimony at trial.[6] Particularly, the prosecutor questioned the defendant's attribution of the victim's suicidal intentions to child custody issues when the two had not actually discussed those issues on the day she was shot. In rebuttal, defense counsel argued that there was a letter from the victim's child custody attorney in her purse, which corroborated the defendant's story about the victim's child custody issues.[7] In response, the prosecutor suggested to the jury that the defendant pointed to the victim's child custody issue because he went through the victim's purse following the shooting.[8] Considering the sequence of the argument, it is unavailing for the defendant to now claim that the prosecutor's statement, to rebut the defendant's argument, was improper. "[T]he state may properly respond to inferences raised by the defendant's closing argument." *State* v. *Robinson*, 227 Conn. 711, 746, 631 A.2d 288 (1993). Additionally, notwithstanding the fact that the prosecutor's comment was a proper response to the inference raised by defense counsel in closing argument, there was sufficient evidence in the record to support the inference that the defendant went through the victim's purse, including the defendant's affirmative efforts to portray the victim's death as a suicide, as well as the time and opportunity he had to do so after the shooting and before the police arrived. Accordingly, we do not conclude that the prosecutor's remark was improper.

The state does, however, concede that the prosecutor's particular statement of "[i]t's shameful" was a gratuitous and improper expression of personal opinion. On the basis of the state's concession, we will assess whether the prosecutor's use of such words deprived the defendant of his due process right to a fair trial in part II of this opinion.

### D

The defendant also claims that the prosecutor's statement that the defendant's version of the events contradicted the gunshot residue (residue) evidence was improper because it was not properly derived from the evidence presented. He argues that the prosecutor's

remark went beyond what the jury fairly could infer because the residue expert did not state with absolute certainty that the victim's hands could not have been on the gun at the time of discharge. We, however, agree with the state's contention that it was based on the evidence and was appropriate advocacy.

The following additional facts are relevant to the evaluation of this claim. The defendant claimed that the gun was in both his and the victim's hands at the time of discharge. Fung Kwok, a chemist at the Connecticut state forensics laboratory, testified as an expert with respect to the residue evidence. He stated that such residue is "a mixture of gasses and particle from a gun fire" and those major elements are lead, antimony, and barium. Kwok testified that if all three elements are found in the same particle, then that is residue. If two out of the three elements are found, then it is consistent with residue. If only one of the three elements is found, then he cannot identify it as residue. Kwok testified that if he finds residue, then the individual fired a firearm, handled a recently discharged firearm, which caused transfer of residue, or was in close proximity to a firearm when it discharged. Kwok analyzed residue kits taken from the defendant's and the victim's hands, and found all three residue elements on the defendant's left palm, and two out of three elements on the back of his left hand and right palm. He only found lead particles on the victim's hands. The prosecutor questioned Kwok: "Are you able to have an opinion that failure to find all three elements on [the victim's] hands would allow you to conclude that her hands were not in close proximity to the gun?" In response, Kwok stated, "[or] maybe covered up." The prosecutor also asked, in considering the wound and Kwok's opinion on the close range of the shot, "if [the victim's] hands were exposed, you would've expected to find . . . the three elements?" Kwok responded, "[y]es."

"[I]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 583. In *State* v. *Jones*, 115 Conn. App. 581, 597–600, 974 A.2d 72, cert. denied, 293 Conn. 916, 979 A.2d 492 (2009), this court concluded that it was not necessarily improper for the prosecutor to argue that the DNA evidence found belonged to the defendant, where the evidence presented was that the defendant was included as a contributor to the DNA profile, if it was a reasonable inference to draw in light of the evidence as a whole. See *State* v. *Brett B.*, 186 Conn. App. 563, 583–85, 200 A.3d 706 (2018), cert. denied, 330 Conn.

961, 199 A.3d 560 (2019).

The present case is similar to *Jones* insofar as it was reasonable for the jury to infer that the victim did not have her hands on the gun at the time of discharge due to the lack of residue on her hands, although the residue expert did not testify to that fact with absolute certainty. "It is the right and duty of the jury to determine . . . what weight, if any, to lend to the testimony of a witness and the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Osbourne*, 138 Conn. App. 518, 534, 53 A.3d 284, cert. denied, 307 Conn. 937, 56 A.3d 716 (2012). The prosecutor properly argued a fair inference from the evidence to the jury. Accordingly, we do not conclude that this remark was improper.

E

The defendant next claims that the prosecutor's use of the words "kill shot"[9] improperly appealed to the jurors' sympathies and emotions. In support of that claim, the defendant argues that "kill shot" implies "more than mere murder . . . ." We disagree with the defendant.

"A prosecutor is not precluded from using descriptive language that portrays the nature and enormity of the crime when supported by the evidence." *State* v. *Andrews*, 313 Conn. 266, 301, 96 A.3d 1199 (2014) (court held that to extent that prosecutor's language appealed to jurors' emotions, it did so because of nature of crime and not because of terminology used by prosecutor). Although characterizing the victim's gunshot wound as a "kill shot" was crude slang and arguably carried an emotional charge, it was not improper because the words used were factually accurate and supported by the evidence. The evidence supports the state's contention that the defendant, without any known or apparent motive, murdered the victim by shooting her in the center of her forehead from a distance of fewer than eighteen to twenty-four inches. On the basis of our review of the record, we conclude that the prosecutor's use of the words "kill shot" was not improper because the victim was in fact *killed* by a *gunshot* to her forehead, and the evidence presented supports the inference that the victim's death was intentionally caused by the defendant.

F

The defendant's final claim is that the prosecutor's use of the word "executed" improperly appealed to the jurors' sympathies and emotions. The state concedes that the prosecutor's use of the word "executed" was improper on the basis of *State* v. *Albino*, 312 Conn. 763, 97 A.3d 478 (2014). In *Albino*, our Supreme Court held that the prosecutor's statement that the defendant "execut[ed]" the victim improperly appealed to the jurors' emotions, passions, and prejudices because "the defendant's evidence was deemed sufficient to warrant jury

instructions on lesser included offenses inconsistent with a wholly unprovoked act of brutality that has been deemed by courts to justify the use of such terms." Id., 774. In the present case, the trial court instructed the jury as to lesser included offenses.[10] Although the record does not reveal the trial court's reason for its decision to issue those instructions, the jury was nonetheless instructed to consider lesser included offenses, which are naturally "inconsistent with a wholly unprovoked act of brutality . . . ." On the basis of the trial court's instruction, *Albino* requires us to conclude in the present case that the prosecutor's use of the word "executed" was improper.[11]

## II

## DUE PROCESS

We now assess whether the prosecutor's use of the word "executed" and the statement "[i]t's shameful" deprived the defendant of a fair trial. "In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, [our Supreme Court], in conformity with courts in other jurisdictions, has focused on several factors. Among them are [1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 540.

We first note that defense counsel did not invite the prosecutor's use of the word "executed," but that counsel did invite the prosecutor's statement of "[i]t's shameful." Defense counsel, however, did not object to either the prosecutor's use of the word "executed" or the statement "[i]t's shameful," and "it [is] highly significant that defense counsel failed to object to any of the improper remarks, request curative instructions, or move for a mistrial." *State* v. *Thompson*, 266 Conn. 440, 479, 832 A.2d 626 (2003); see also *State* v. *Payne*, supra, 303 Conn. 568 ("[w]hen no objection is raised at trial, we infer that defense counsel did not regard the remarks as 'seriously prejudicial' at the time the statements were made"). "Beyond defense counsel's failure to object, in determining the severity of prosecutorial impropriety, we look to whether the impropriety was blatantly egregious or inexcusable." *State* v. *Fauci*, 282 Conn. 23, 51, 917 A.2d 978 (2007). Because defense counsel did not object and the use of the sole words "executed" and "[i]t's shameful" was not blatantly egregious in light of the facts before the jury, we do not conclude that the impropriety was severe.

The impropriety was infrequent; it consisted of a few words following three full days of evidence and was

made during lengthy closing argument. See, e.g., *State v. Bermudez*, 274 Conn. 581, 600–601, 876 A.2d 1162 (2005) (court found improper remarks infrequent where remarks consisted of only two instances of brief duration, which was not grossly egregious when viewed in context of entire trial). Although the use of the word "executed" went to the central issue of intent, the statement of "[i]t's shameful" did not because it pertained to the possibility that the defendant might have gone through the victim's purse. Indeed, we conclude that the prosecutor's characterizing the defendant's having gone through the victim's purse as "shameful," under the circumstances of this murder trial, is rather innocuous.

The trial court also instructed the jury on multiple occasions throughout both the trial and closing argument that closing argument is not to be considered as evidence and that "[w]hat [counsel] have said to you is their way of presenting to you what they think the evidence has proven or has not proven, as the case may be, but it is not evidence. If your recollection of the facts differs [from] what the attorneys have presented, it's your recollection that controls." The trial court did not specifically address the use of the word "executed" because there was no objection by the defense. In light of the circumstances, the curative measures employed by the court were adequate.

Finally, the state's case was strong enough so that it is not reasonably likely that the jury's verdict would have been different if the state had not used the word "executed" and the phrase "[i]t's shameful." The defendant's inconsistent story as to what actually occurred in his bedroom, the residue evidence, and the location of the victim's wound all undermined the defendant's theory that he accidentally killed the victim when he tried to stop her from committing suicide.

On the basis of our analysis of these six factors, we have no difficulty concluding that the defendant failed to prove that the prosecutor's use of the word "executed" and the statement "[i]t's shameful" was a harmful error that deprived him of his due process right to a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The video recording of that interview was admitted into evidence, along with a corresponding transcript.

[2] The defendant pleaded guilty to the possession of narcotics with intent to sell and criminal possession of a revolver charges prior to trial.

[3] Although the defendant did not object to the remarks he challenges on appeal, we still review his claims because "a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of [*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015)], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Turner*, 181 Conn. App. 535, 556, 187 A.3d 454, cert. granted, 330 Conn. 909, 193 A.3d 48 (2018). We note, however, that defense counsel's failure

to object is highly significant and indicates lack of severity of the alleged impropriety, as we discuss later in this opinion. See *State* v. *Thompson*, 266 Conn. 440, 479, 832 A.2d 626 (2003).

[4] The defendant specifically challenges the following statement: " 'Oh, bleep, now I'm in trouble.' That is the response of a person and that's what his response was. Because I ask you to consider, how upset was he? How upset was he that . . . as he testified, his dear friend . . . just got shot in his presence? Seems awful calm when he was interviewed by the police hours later. It also seems that every question presented to him was coolly and with calculation responded to. Ask yourselves if he had any degree of upset when he was talking to the police on March 17, 2015."

[5] The defendant claims that the entirety of the following remark by the prosecutor was improper: "I want to draw you to another thing the defendant said. He said even after it was all done and he came back, just to look at [the victim], the phone went off and he couldn't . . . get to the point where he could answer the phone when he saw that it was [the victim's] mother calling. Now, ask yourselves, ladies and gentlemen, can you put yourselves in that position? If we believe what the defendant said . . . [the victim] just had a horrible conversation with her mother where she hopes she's going to die, with gun in hand she says, I'm sick of all these people. Something goes down, [the victim] gets shot in the head, and then there is a phone call from her mother. I, ladies and gentlemen, would have a few choice words for her mother at that point in time if I just witnessed my friend killing herself or dead after having tried to [kill] herself. He didn't answer the phone because he killed her. He didn't answer the phone because he's in protection mode. He planted the gun . . . in . . . her right hand because he's in protection mode."

[6] The prosecutor argued: "[A]ll [the defendant] says through that [police] interview is, [the victim] had child custody issues. Yet, he acknowledges on the stand yesterday that we never discussed and she never stressed about child custody issues during that overnight on March 17, 2015. It's out of whole cloth . . . . She wasn't trying to kill herself."

[7] Defense counsel stated: "[Two and one-half] years ago [the defendant is] talking about [the victim is] stressing about her kid. She's stressing about the custody of her kid. And he kept saying that. He kept saying that. Well, how the hell do we know if she was stressing about her kid? Ladies and gentlemen . . . Lead Detective [Anthony] Rykowski, do you recall his testimony when I asked him about that Coach bag . . . . And what was one of the pieces of correspondence in that bag? . . . [The victim's] bag. A letter from her child custody attorney. Gee, this guy with a ninth grade education put all that together and came up with this horrible story?"

[8] The prosecutor stated: "How you're left with evidence because the thing is . . . you come back to what did [the defendant] say, and once you dismiss his version of events, as it's contradicted by his own statements . . . and it's contradicted by the gunshot residue evidence, [the victim's] hands weren't up. Her hands weren't next to the gun. . . . What's interesting about that letter that may exist, that was testified to, is who was alone with the dead [victim] for about forty minutes, possibly thinking about what he could say to the police as to what stressed her out? Because, again, you got to [juxtapose] all of that with what [the defendant] told you on the stand yesterday; that's the conversation that led [the victim] to her suicidal brink. Yet, he never told any of that to the police, but what he shares with the police is there's custody issues. Custody issues, that subject matter, is actually sitting in her purse while he's alone, and, again, ladies and gentlemen, your minds can run rampant at this point, he already admitted he put a gun in hand . . . would you doubt he went into her purse to see what made her tick? It's shameful. It's shameful, but what you are left with, again, ladies and gentlemen, is the circumstances of her death, an intentional killing at close range to her forehead."

[9] The prosecutor argued to the jury that "[defense counsel] will say to you . . . that since no motive evidence has been presented to you, [the victim] was not dead in the defendant's bedroom with a kill shot to her forehead."

[10] The trial court instructed the jury as to the lesser included offenses of intentional manslaughter, reckless manslaughter, and criminally negligent homicide.

[11] We do, however, note that other states tend to focus on the overall strength of the evidence, instead of whether an instruction on lesser included offenses is given, when determining whether a prosecutor's use of the words "executed" or "in cold blood" was improper. Our Supreme Court's decision

in *Albino* outlines certain cases that take this alternative approach: "*Commonwealth* v. *Murphy*, 442 Mass. 485, 496, 813 N.E.2d 820 (2004) (statement that victims were murdered in cold blood not improper where evidence permitted inference that murders were unprovoked, senseless, and brutal), *People* v. *Walton*, Docket No. 259584, 2006 WL 2033999, *2 (Mich. App. July 20, 2006) (prosecutor's characterization of offense as execution not improper because clearly supported by evidence that defendant and accomplices made unarmed victims lie down on floor and then shot them), and *State* v. *Harris*, 338 N.C. 211, 229, 449 S.E.2d 462 (1994) (at trial for first degree murder involving calculated armed robbery and unprovoked killing, it was not improper for prosecutor to refer to defendant as cold-blooded murderer)." (Internal quotation marks omitted.) *State* v. *Albino*, supra, 312 Conn. 775.

———————————————————